UNITED STATES of America, Appellee,

v.

Lucelly ABADIA, a/k/a Lucelly
Ochoa, Appellant.

No. 91–1562.

United States Court of Appeals,
Eighth Circuit.

Submitted Sept. 13, 1991.

Decided Nov. 19, 1991.

Michael Dwyer, St. Louis, Mo., argued,
for appellant.

Howard J. Marcus, St. Louis, Mo., argued, for appellee.

Before BOWMAN, Circuit Judge, ROSS,
Senior Circuit Judge, and LOKEN, Circuit
Judge.

BOWMAN, Circuit Judge.

On May 20, 1990, law enforcement officers intercepted and detained the appellant, Lucelly Abadia, immediately upon her arrival at Lambert International Airport in St. Louis, for the purpose of investigating a tip that she was smuggling cocaine. During her detention she consented to the search of her luggage which led to the discovery of cocaine and, ultimately, to her formal arrest. Prior to her trial, she unsuccessfully moved for the suppression of the statements that she made and the evidence that was seized from her at the airport. After a two-day jury trial she was convicted for possessing cocaine with the intent to distribute it, in violation of 21 U.S.C. § 841(a)(1) (1988), and sentenced to sixty-three months in prison. On appeal she contends it was error for the District Court [1] to deny her suppression motion because the detention that proceeded her formal arrest (hereinafter her pre-arrest detention) was itself a de facto arrest and was unsupported by probable cause. We affirm.

On or about May 18, 1990, a confidential informant advised Enrique Aguilar, Senior Special Agent for the United States Immigration and Naturalization Service, that on May 20 Lucy Abadia would be flying from Miami to St. Louis, with one or two kilograms of cocaine in her check-on luggage.[2]

1. The Honorable John F. Nangle, Senior United States District Judge for the Eastern District of Missouri.

2. The facts in this opinion are taken from the magistrate's findings of fact, see United States v. Abadia, 134 F.R.D. 263, 265–269 (Magis.Ct.1990) (Order and Recommendation of United States Magistrate), reprinted in Addendum C to Appel-

lant's Brief (hereinafter Magis. Recommendation), which the District Court adopted, see United States v. Abadia, No. 90–101CR(1), mem. op. at 1 (E.D.Mo. Nov. 27, 1990), reprinted in Addendum B to Appellant's Brief at D–1, and which neither side challenges in this appeal.

The informant described Abadia as a Colombian female in her late twenties, five feet four inches tall, with wavy, dark hair. Because this particular informant had provided accurate information on two recent occasions, Agent Aguilar considered the tip reliable and he proceeded to verify the information. Upon contacting the information office of Transworld Airlines (TWA), Agent Aguilar learned that a Lucy Abadia was listed as a passenger on TWA flight 683, which was flying to St. Louis from Miami on May 20. This information was passed along to the Miami Airport Police, but efforts to intercept Abadia in Miami failed.

Agent Aguilar thereupon conveyed this information to Sergeant Larry Wheeler, a St. Louis County Police Officer who had been assigned to the Drug Enforcement Agency (hereinafter DEA) Task Force as a Detective at Lambert International Airport. Sgt. Wheeler then contacted TWA and verified that Abadia would be coming into St. Louis on flight 683. He also learned that that flight was scheduled to arrive in St. Louis at gate 46 at 2:56 p.m. and that Abadia's seat number was 17A.

Sgt. Wheeler, Agent Aguilar, and several other law enforcement agents waited for flight 683 at gate 46. When it arrived, Sgt. Wheeler, Officer Kimberly Presley of the Airport Police Department, and several other officers obtained permission from the captain to board the plane. To aid the officers, the flight attendant instructed the passengers to remain seated. With the passengers still on the plane, Sgt. Wheeler approached row 17,[3] saw a woman in that row who fit the informant's description of

Abadia,[4] and identified himself to her as a police officer, showing her his DEA credentials. He asked her if she was Lucy Abadia. She nodded and also indicated that she did not understand much English. He then directed her to follow him off the plane. After Abadia had disembarked, Officer Presley asked her for her ticket and Abadia complied. Officer Presley saw that the ticket was in the name of Lucelly Abadia[5] and returned it to her. Sgt. Wheeler and Officer Presley then led Abadia to the airport DEA office, approximately 2400 feet away from the location at which Abadia arrived. There they were met by DEA Task Force Officer Michael Williams, who was to serve as a Spanish/English translator.[6]

Officer Williams identified himself to Abadia, showed her his DEA credentials, and read Abadia her *Miranda* rights in Spanish from a Spanish–English language card. He also had her read them to herself. Abadia indicated that she understood her rights and would talk to the law enforcement officers. Officer Williams then communicated with her in Spanish and he told Sgt. Wheeler in English what he and Abadia were saying. He explained to Abadia that they were investigating her for carrying cocaine in her luggage and asked her whether she had checked any luggage. She responded affirmatively. He also asked her if she packed it herself and whether she would describe it to him. She responded affirmatively and described her suitcase to him. He asked her if she would give them her claim ticket and permit an officer to retrieve her suitcase from the carousel. She said that they could do so and gave him her ticket. After another

3. At oral argument, counsel for Abadia stated that Abadia was not sitting in seat 17A, but was seated in the same row, when the police boarded her flight.

4. Sgt. Wheeler testified that he determined, as he approached Abadia on the plane, but before he had confirmed her identity, that she fit the physical description provided by the informant. *See* Transcript of Abadia's Preliminary Examination and Detention Hearing at 7.

5. Neither of the parties nor the magistrate found to be significant the fact that the infor-

mant referred to Abadia as "Lucy Abadia," Magis. Recommendation at 3, that Abadia responded affirmatively when asked if she was "Lucy Abadia," *id.* at 4–5, but that her ticket was in the name of "Lucelly Abadia." *Id.* at 5.

6. Officer Williams had studied Spanish in high school and college and periodically served as a police translator when Spanish speaking subjects were arrested. Sgt. Wheeler, having anticipated that Abadia might need a translator, had instructed Officer Williams to meet them at the airport's DEA office.

officer had retrieved her bag, Officer Williams asked her if she would give the officers permission to search it. Abadia answered affirmatively and motioned toward the suitcase. Sgt. Wheeler then searched the suitcase and discovered, concealed in a shoe box, two containers wrapped in brown tape and immersed in a layer of liquid hand soap.[7] Within the containers he found clear plastic bags of white powder, which a field test indicated was cocaine. Officer Williams then told Abadia that she was under arrest and he again read her her *Miranda* rights. In the search incident to the arrest, certain documentary papers were seized from Abadia's purse. In addition, Abadia responded to questions from Officer Williams regarding the source of the cocaine. At no time did she request an attorney or that the questioning stop.

On June 15, 1990, Abadia was charged with one count of possessing cocaine with intent to distribute it, in violation of 21 U.S.C. § 841(a)(1). Prior to trial, she moved for the suppression of all the statements she made and all the evidence seized from her at the airport on May 20, 1990, on the basis that her pre-arrest detention violated her rights under the Fourth Amendment.[8] The District Court adopted the recommendation of the Magistrate Judge[9] and held that her pre-arrest detention did not constitute an arrest and also that it was supported by "the reasonable and articulable suspicion [necessary] to support a *Terry* stop." *United States v. Abadia*, No. 90–101CR(1), mem. op. at 5 (E.D.Mo. Nov. 27, 1990), *reprinted in* Addendum B to Appellant's Brief at D–5.[10] It also concluded that her statements were voluntary and that she consented to the search of her luggage, and it therefore denied the motion to suppress. *Id.* at 6. The court did not reach the issue of probable cause.

On appeal Abadia claims that it was error for the court to deny her suppression motion as, she contends, her pre-arrest detention exceeded the brief and limited investigatory detention permitted in a *Terry*-type stop and thus constituted a de facto arrest. She further argues that this de facto arrest was unconstitutional because it was not supported by probable cause, and thus the statements that she made and the evidence that was seized are inadmissible as the fruits of an illegal seizure. *See Florida v. Royer*, 460 U.S. 491, 501, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983) (plurality opinion) (opinion of White, J.) ("statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will.").[11] We disagree with Abadia's second claim—that her pre-arrest detention was not supported by probable cause[12]—and we therefore affirm

---

7. Initially, when Sgt. Wheeler attempted to open the suitcase, he discovered that it was locked. Officer Williams asked Abadia if they could have the keys to her suitcase and she responded by retrieving them from her purse, which was still in her possession, and giving them to the officers. She also opened a combination lock on the front of the suitcase and opened the suitcase for the officers.

8. She also moved for the suppression of the fruits of any electronic surveillance. As there was no electronic surveillance of Abadia, this portion of the motion was denied.

9. The Honorable David D. Noce, United States Magistrate Judge for the Eastern District of Missouri.

10. During oral argument, Abadia conceded that the District Court was correct in concluding that "Sergeant Wheeler possessed the reasonable and articulable suspicion [necessary] to support a *Terry* stop of [Abadia]." District Court's Order at 5. The government likewise conceded that Abadia was seized, within the meaning of the fourth amendment, when Sgt. Wheeler directed her off the plane. We therefore do not address these issues.

11. Justices Marshall, Powell, and Stevens joined in this opinion and judgment. Justice Brennan concurred in the result.

12. Although the District Court did not reach the issue of whether there was probable cause for arrest, "[w]e may affirm a judgment on any ground supported by the record even if not relied upon by the district court...." *Lane v. Peterson*, 899 F.2d 737, 742 (8th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990).

her conviction.[13]

■ "Probable cause ... to make a war-rantless arrest [exists] when, at the moment of the arrest, the collective knowledge of the officers involved," *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.), *cert. denied*, 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987), is "sufficient to warrant a prudent man in believing that the [defendant has] committed or [is] committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225, 13 L.Ed.2d 142 (1964).[14] While " 'bare suspicion' of criminal activity is not sufficient to establish probable cause," *United States v. Caves*, 890 F.2d 87, 93 (8th Cir.1989), police officers are not "required to have enough evidence to justify a conviction before they make a warrantless arrest." *Id.* Whether probable cause exists is a common-sense and practical determination and must be based upon the totality of the circumstances. *Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983).

In *Draper v. United States*, 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959), the Supreme Court addressed the question of whether probable cause was present in a factual setting similar to the one now before us. There, the police were given a tip by a reliable informant that Draper would be taking a train from Chicago to Denver either on September 8 or 9 and that he would be carrying three ounces of heroin at the time. *Id.* at 309, 79 S.Ct. at 331. The informant described Draper as "a Negro of light brown complexion, 27 years of age, 5 feet 8 inches tall, weigh[ing] about 160 pounds, ... wearing a light colored raincoat, brown slacks and black shoes," *id.* at 309 n. 2, 79 S.Ct. at 331 n. 2. He also stated that Draper habitually walked fast and that he would be carrying a tan zipper bag when he arrived in Denver. On September 9, police staking out the Denver train station observed a man, who fit exactly the description provided by the informant, get off a train from Chicago and begin to walk quickly toward an exit. Based upon the tip and their independent corroboration of virtually all the facts contained in that tip,[15] the police arrested the suspect, Draper, who indeed was carrying heroin. *Id.* at 309–10, 79 S.Ct. at 331–32. In rejecting Draper's claim that he was arrested in violation of the Fourth Amendment, the Supreme Court held that, given the detail of the tip and the extent to which it was corroborated, the arrest was supported by probable cause. *Id.* at 312–14, 79 S.Ct. at 333–34. Specifically, the Court observed that the informant's information "had always been found accurate and reliable," *id.* at 313, 79 S.Ct. at 333, that Draper fit the physical description provided in the tip, that he wore the same clothes as described in the tip, that he arrived in Denver on one of the days on which the informant said he would arrive, that he arrived on one of the trains on which the informant said he would arrive, and that he walked quickly as the informant said he would. The Court reasoned that, given the extent to which the tip was corroborated, the police certainly "had 'reasonable grounds' to believe that the remaining un-verified bit of [the tip]—that Draper would have the heroin with him—was likewise true." *Id.*

■ The same comments can be made about the tip that precipitated Abadia's pre-arrest detention. Here the confidential informant, on two recent occasions, had pro-

**13.** We need not and do not address the question of whether Abadia's pre-arrest detention constituted more than a *Terry*-type detention.

**14.** As the question of whether there was probable cause to arrest is an objective question, Sgt. Wheeler's characterization of the informant's description of Abadia as "sketchy," *see* Transcript of Abadia's Preliminary Examination and Detention Hearing at 7, is not dispositive. *See also Klingler v. United States*, 409 F.2d 299, 304

(8th Cir.) ("Because probable cause for an arrest is determined by objective facts, it is immaterial that [the arresting officer] ... testified that he did not think that he had 'enough facts' upon which to [make an] arrest...."), *cert. denied*, 396 U.S. 859, 90 S.Ct. 127, 24 L.Ed.2d 110 (1969).

**15.** The only fact noted by the Supreme Court that the police had not corroborated was whether Draper actually was carrying the three ounces of heroin that the informant said he would be

vided Agent Aguilar with accurate and reliable information. The informant's physical description of Abadia was almost as detailed as the physical description of Draper,[16] and, like Draper, Abadia matched the physical description provided by the informant. She also arrived on one of the flights predicted by the informant, and, going *Draper* one better, she arrived on the exact date predicted by the informant. In *Draper* the informant also had predicted, and the police confirmed, the attire worn by the suspect, the type of bag he carried, and the manner in which he walked, none of which was addressed by the informant's tip here. Here, however, the police confirmed Abadia's identity before they directed her off the plane. No such pre-arrest positive identification occurred in *Draper*. There the informant, as here, did tell the police the name of the person described in the tip, but the police apparently arrested Draper before confirming his identity.[17] *See Draper*, 358 U.S. at 309–10, 79 S.Ct. at 331–32. Thus, although we recognize that there are factual differences between *Draper* and the case at bar, we nevertheless find *Draper* highly instructive on the issue of whether the police had probable cause to arrest Abadia at the moment Sgt. Wheeler directed her to follow him off the plane. *Cf. United States v. Sumpter*, 669 F.2d 1215, 1218 (8th Cir. 1982) ("because of the myriad of unique factors that may go into a determination of probable cause, each case must be decided on its own facts; one decision seldom disposes of the next."). Considering the totality of the circumstances present in this case, we conclude that by the time Sgt. Wheeler located Abadia on the plane, determined that she fit the informant's physical description of Lucelly Abadia, the woman who would be smuggling cocaine, and had confirmed her identity, there was probable cause to place her under arrest.[18]

For the reasons set forth above, we reject Abadia's claim that her pre-arrest detention constituted a de facto arrest unsupported by probable cause, in violation of the Fourth Amendment. The District Court did not err in denying Abadia's suppression motion, and her conviction is AFFIRMED.

---

carrying. *Draper*, 358 U.S. at 313, 79 S.Ct. at 333.

**16.** The physical description of Abadia was that she was a Colombian female in her late twenties, five feet four inches tall, with wavy, dark hair. The physical description of Draper was that he was "a Negro of light brown complexion, 27 years of age, 5 feet 8 inches tall, weigh[ing] about 160 pounds." *Draper*, 358 U.S. at 309 n. 2, 79 S.Ct. at 331 n. 2.

**17.** The fact that the police had not verified Draper's identity prior to his arrest is not addressed in Draper. *Cf. supra* note 15 and accompanying text.

**18.** Abadia does not appear to claim that she was subjected to a de facto arrest prior to the mo-

ment Sgt. Wheeler directed her off the plane. Even if she took such a position, it would merit little discussion. *See Royer*, 460 U.S. at 497, 103 S.Ct. at 1323 ("law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.") *and Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 2386–88, 115 L.Ed.2d 389 (1991) (holding that consent to search a bag is not vitiated simply because police officer requested consent to search from passenger on bus which was about to depart).