**Marvin Eugene DYER, Plaintiff,**

**v.**

**Gene SHELDON, individually and in his capacity as a police officer for the village of Hemmingford, Nebraska; James H. Olson, individually and in his capacity as a police officer for the village of Hemmingford, Nebraska, and The Village of Hemmingford, Defendants.**

No. 7:CV92–5003.

United States District Court, D. Nebraska.

July 22, 1993.

Joy A. Shiffermiller, Ruff, Nisley Law Firm, North Platte, NE, for plaintiff.

James R. Hancock, Hancock, Denton Law Firm, Scottsbluff, NE, for defendants.

John R. Bellavia, Jr., Nebraska Dept. of Social Services, Lincoln, NE, for plaintiff Interested Party.

## MEMORANDUM OF DECISION

PIESTER, United States Magistrate Judge.

Plaintiff filed this action alleging defendants violated his Fourth Amendment rights in violation of 42 U.S.C. § 1983. Trial was held in North Platte, Nebraska commencing on June 14, 1993 and continuing for 4 days.[1] At the close of plaintiff's case defendants made a motion which I construed as a motion for judgment on partial findings of fact which I granted in part.[2] For reasons stated more fully below, I shall enter judgment for the defendants.

## FINDINGS OF FACT

Plaintiff lives in the village of Hemmingford with his wife, Linda, and Linda's three children.[3] On the evening of August 6, 1991 plaintiff, Linda, the three children and two of plaintiff's children were at plaintiff's trailer home packing for a vacation the following day. Plaintiff drank between four and five beers while he was packing. At some time after midnight, plaintiff and Linda had an argument. The argument carried over into the bathroom where plaintiff pushed Linda into a shelf, causing her to fall to the floor in pain.[4] One of the children called an ambulance.

---

1. The parties consented to have this action proceed before me pursuant to 28 U.S.C. § 636(c).

2. I granted defendants' motion with respect to plaintiff's probable cause for arrest claim. I denied the motion with respect to the excessive force claim.

3. The three are Linda's from a previous marriage. Plaintiff has two children from a previous marriage.

4. Plaintiff originally claimed he did not strike his wife. That testimony was effectively impeached by the use of a sworn deposition in which plaintiff stated that he hit Linda "probably in the

Within 10 minutes, a number of emergency medical technicians (EMT's) arrived at plaintiff's home. Pursuant to city policy,[5] defendant Sheldon, a police officer, accompanied the EMT's to the scene and into the home. Sheldon had been a police officer for nine months. He had not yet attended the Nebraska Law Enforcement Training Academy at that time.[6] Sheldon, on duty and in uniform, was told that plaintiff had struck Linda causing the injury which precipitated the ambulance call. As the EMT's prepared to take her to a health clinic to be examined, Linda expressed concern about the safety of the children and requested that someone stay at the home until she returned. Sheldon and Jim Yardley, the village's fire chief, remained in the home with plaintiff and the children.

Sheldon remained near plaintiff until Linda returned. Plaintiff was not told he was under arrest at that time. He asked Sheldon to leave a number of times but Sheldon refused. In an attempt to alleviate the pressure of the situation, Sheldon also asked plaintiff to leave. Plaintiff refused.

The EMT's returned Linda approximately 30–45 minutes after they had departed. Plaintiff spoke with Linda briefly in the kitchen and then walked out of the trailer home. Sheldon also talked to Linda, who stated that plaintiff had struck her. Deciding to arrest plaintiff, Sheldon radioed for a backup officer.[7] Sheldon then followed plaintiff outside and reinitiated their conversation. A loud argument ensued between plaintiff and Sheldon. During the argument, plaintiff was standing on the passenger side of his car facing the trailer home. Sheldon was facing plaintiff, standing between the trailer and plaintiff. After returning Linda to the trailer, a number of EMT's gathered in the yard watching the argument. They were standing to plaintiff's right, as he was facing the trail-

er, at a distance of about 30 feet from plaintiff and Sheldon.

The backup officer, defendant Olson, arrived at plaintiff's home. Olson parked his car behind the EMT's and passed them as he approached plaintiff and Sheldon. Seeing Olson approach, Sheldon informed plaintiff he was under arrest. Plaintiff asked Olson if he was under arrest and Olson replied affirmatively. Olson approached plaintiff and Sheldon so that he was also facing plaintiff. As plaintiff was facing the two officers, Sheldon was facing him on plaintiff's left and Olson was facing him on plaintiff's right.

The accounts of what took place next are in dispute. Several witnesses gave differing accounts of how defendants effectuated the physical arrest of plaintiff. I shall discuss each witness' testimony regarding these particular events.

A. Plaintiff

On direct examination, plaintiff stated that he wished to go inside and talk to his wife after he was informed he was under arrest. He began to walk to the house, and as the officers attempted to take him into custody, he pulled his arms away from them a number of times. Plaintiff stated Sheldon grabbed plaintiff's left arm and placed one cuff on that wrist. Plaintiff was unable to recall the exact events, only that "Everything happened so fast, and I ended on up on top of my head." While plaintiff was on the ground, one of the officers was on top of him and applied handcuffs to both wrists. While on the ground, plaintiff complained of back and neck pain and numbness in his legs.

It is undisputed that after plaintiff was handcuffed, defendants moved plaintiff approximately 40 feet to Sheldon's squad car, located across the street. To move plaintiff, Olson and Sheldon each placed a hand under one of plaintiff's armpits and pulled him up-

---

upper body." Plaintiff later admitted he pushed her against a bathroom shelf.

5. The policy requires a police officer to accompany the rescue squad on every ambulance call.

6. Nebraska law requires police officers to attend the training center within one year of the beginning of their employment as police officers. Hemmingford had a policy of sending new offi-

cers to the academy near the end of the first year of their employment to ensure that the officer would be retained by the city as an employee. Sheldon attended the academy from September 1991 to November 1991.

7. A Hemmingford policy requires two officers to be present when an arrest is made.

ward. Holding his torso above the ground and allowing his feet to drag on the ground, they pulled plaintiff to the patrol car. When they reached the patrol car the officers lowered plaintiff to the ground and instructed Yardley to contact the ambulance to return to the scene.[8] Yardley complied and the ambulance returned. Plaintiff was placed on a body board and taken to the Box Butte General Hospital where he remained for 16–17 hours. After a number of examinations were conducted, plaintiff was taken by ambulance to the Regional West Medical Center in Scottsbluff where it was determined plaintiff had suffered a fractured vertebra. For some time, plaintiff was paralyzed from his neck down. By the time of trial, he had regained use of both arms but remains paralyzed from the chest down.

On cross examination, plaintiff admitted to pulling his arms from the officers as they attempted to arrest him. He denied striking either officer. He once again stated he was taken to the ground so quickly that he did not recall exactly how that took place. He stated that neither officer struck him either with their hands or with any objects.

## B. Dr. Ernest W. Beehler

Plaintiff called Dr. Beehler as a witness. Dr. Beehler has been a neurosurgeon for 33 years. He examined plaintiff at the Regional West Medical Center and performed surgery on plaintiff's spine after the arrest. Beehler's examination of plaintiff disclosed a subluxation, or dislocation, of two vertebrae, C–7 and T–1,[9] a fracture of the joint between them, and the detachment of the muscle between the vertebrae. He concluded the fracture and subluxation caused the paralysis. Further, he concluded the fracture and subluxation were caused by an injury, as opposed to a natural occurrence. After being told of the circumstances surrounding the arrest, he concluded the injuries were caused when plaintiff's head struck the ground during the arrest.

Dr. Beehler stated a fracture is relatively common and may result from varying amount of force. He stated such injuries are, at times, caused by a minor amount of force, and at other times require a great deal of force to take place. He testified that the blow causing the spinal injury was a flexion injury and likely occurred while plaintiff's head was tilted forward. Based on Dr. Beehler's education, experience and training, I accept as true his conclusions regarding causation of the injuries and the determination that this was a flexion injury.

## C. James Yardley

Plaintiff presented the videotaped deposition of James Yardley, the Fire Chief of the village of Hemmingford. He was standing with the EMT's in plaintiff's front yard when the arrest took place. Yardley stated that he did not see plaintiff swing at either defendant. Yardley testified Olson reached across plaintiff's body to place a handcuff on plaintiff's left arm. He admittedly was unable to see clearly what took place and did not know the precise motions the three men went through as plaintiff was taken to the ground. He believed one of plaintiff's wrists was cuffed. Yardley stated that Sheldon appeared to be helping Olson take down plaintiff. He saw plaintiff fall forward and strike the ground upper body first. He first heard plaintiff crying when plaintiff was lying on the ground near the patrol car, after the officers had carried him across the street.

Defendants called Yardley to the stand for live testimony during their case-in-chief. He testified to substantially the same information given in the deposition. He stated that when Olson reached plaintiff and Sheldon, plaintiff attempted to move away from the officers by backing along the side of the car. He added that he did not see plaintiff strike the defendants and did not see defendants strike or kick plaintiff. He was unable to see plaintiff's arms or hands during the incident

---

**8.** All of the EMT's except Yardley left the scene when plaintiff was on the ground and handcuffed.

**9.** Dr. Beehler testified the vertebrae in the spine are numbered for ease of discussion. From the

brain, the spine in numbered in sequence, Cervical (or C) 1–7; Thoracic (or T) 1–12; and Lumbar (or L) 1–5. Thus, C–7 and T–1 are adjacent vertebrae.

and did not see if Sheldon was attempting to grab plaintiff's hands. Regarding the takedown, he testified the men appeared to come down in a heap. He did not see anyone lift plaintiff from the ground. Further, he believed plaintiff fell face-first to the ground. Yardley instructed the other EMT's to leave at that time. After defendants carried plaintiff to the patrol car, Yardley heard plaintiff say that he could not feel his legs. Yardley recalled the ambulance and plaintiff was placed on a stretcher to be taken for medical attention.

### D.  Dr. Samuel Smith

Plaintiff offered the deposition of Dr. Smith who reviewed plaintiff's medical records. On cross examination by defendants' counsel, Dr. Smith stated plaintiff's injury was consistent with a "flexion component. In other words, with the head bent slightly forward." Dr. Smith stated the injury was inconsistent with a chest-first, as opposed to head-first, fall. Based on Dr. Smith's education, experience and training, I accept as true his conclusions that this was a flexion injury.

### E.  Defendant Sheldon

Defendant Sheldon testified he saw Olson reach for a set of handcuffs. Sheldon reached out and grabbed plaintiff's left wrist with his own left hand. Plaintiff pulled away his hand. Sheldon lost his balance and stepped backward to right himself. He stated Olson had plaintiff upright and was holding plaintiff's right shoulder and hand. Sheldon saw plaintiff attempt to knee Olson in the groin. Sheldon reengaged and attempted to grab plaintiff's left wrist with both hands but was unable to gain control over it. Plaintiff began to fall and landed face-first on the ground. Sheldon stated that neither he nor Olson picked up plaintiff and threw him to the ground. Sheldon testified Olson handcuffed plaintiff, but he was uncertain whether a handcuff had been applied while plaintiff was standing.

Sheldon testified that plaintiff cried but said nothing while on the ground. Olson asked plaintiff to get up and walk to the patrol car. Sheldon did not recall plaintiff making any response. Sheldon reached under plaintiff's left arm and Olson under plaintiff's right; the men lifted plaintiff by his armpits and carried him to the car with his feet dragging on the ground. Sheldon asserts plaintiff said nothing while being carried. Upon reaching the car, the officers placed plaintiff on the ground. Plaintiff then said he could not feel his legs and that his back hurt. Olson held plaintiff in an attempt to support his back. One of the officers called Yardley and requested medical attention for plaintiff. The EMT's returned and placed plaintiff on a body board and stretcher.

### F.  Defendant Olson

Defendant Olson testified that he walked, in uniform, from his car, past the EMT's, to where plaintiff and Sheldon were standing. He stood facing plaintiff, toward plaintiff's right. Sheldon stood on Olson's right, also facing plaintiff. Olson reached for plaintiff's right arm with his own right hand and for his handcuffs with his left hand.[10] Plaintiff freed his right hand and punched Olson in the left temple area.[11] Olson began to fall backward but grabbed plaintiff's right wrist. At that time, Sheldon reached for plaintiff's left wrist. Plaintiff then kneed Olson in the groin twice, causing Olson to fall to one knee on plaintiff's right side. With his right hand, Olson was able to grab plaintiff's right wrist. Olson reached his left arm behind and then through plaintiff's legs and grabbed plaintiff on the front of the right thigh. He pulled on the leg and caused plaintiff to fall forward onto the ground, landing forehead first. They came to rest with plaintiff lying prone and Olson kneeling above plaintiff, straddling plaintiff's right leg. Olson cuffed both of plaintiff's wrists behind his back. Olson stated that approximately five seconds elapsed

---

**10.** Olson supplemented his testimony with a visual demonstration he conducted with the assistance of Sheldon and Yardley. The demonstration contained only sparse verbal explanation on the record.

**11.** Defendant Olson was uncertain whether he was able to place a cuff on plaintiff's right hand.

from the time plaintiff struck him until they ended up on the ground. Olson was not in control of plaintiff until they were both on the ground.

Olson told plaintiff to get up and go to the patrol car. Olson testified plaintiff said, "Fuck you." Olson stated plaintiff could be taken to the car "the hard way" and then, with Sheldon, picked up plaintiff under the armpits and carried plaintiff, with toes dragging on the ground, to the patrol car. They carried plaintiff approximately 45 feet. Once at the patrol car, plaintiff complained that his hands, arms and back hurt and that he could not feel his legs. Olson tried to hold plaintiff steady and called for the EMT's to return to the scene. Olson suffered a dislocated thumb and a contusion on the left temple as a result of the incident.

### F. David L. Stone

During rebuttal, plaintiff called David L. Stone, a volunteer firefighter for the village of Hemmingford since 1986. Stone was with the EMT's in plaintiff's front yard when the arrest took place. Stone testified that he did not see plaintiff strike Olson. He stated he was originally looking away from the fight but heard what appeared to be a struggle and looked toward the source of the noise. There, he saw Olson staggering backward and then returning forward, toward plaintiff. He stated Olson grabbed plaintiff on the lower part of the body; Stone believed Olson grabbed both legs. He testified plaintiff fell forward, but not over either officer. He was uncertain whether plaintiff was handcuffed while standing. Plaintiff impeached this testimony with Stone's statement in a deposition that plaintiff was "tackled like a football player." Stone further stated plaintiff fell chest-first, not face-first.

### G. Daniel L. Swanson

Plaintiff's final rebuttal witness was Daniel L. Swanson, a utility superintendent and the present fire chief for the village of Hemming-

ford. Swanson testified that although he was present in plaintiff's front yard, he did not actually see the officers take plaintiff to the ground. He stated he saw Olson approach plaintiff. Swanson looked away briefly and when he looked back, plaintiff was on the ground. He did not see plaintiff swing at Olson, or either of the officers hit or kick plaintiff. Swanson had testified during the criminal hearing [12] that both officers were behind plaintiff and that plaintiff was moving forward when the arrest took place. During his testimony in the present case, he stated plaintiff was facing the officers with Sheldon on his left and Olson on his right. Also in the criminal case, Swanson stated that the "officers on both sides [of plaintiff] just broke him down."

### Summary

Considering the varying recollections and the sometimes conflicting testimony regarding what took place in plaintiff's arrest,[13] I make the following findings of fact. Olson approached plaintiff from plaintiff's right. Both Olson and Sheldon were facing plaintiff, Olson on plaintiff's right, Sheldon on plaintiff's left. Sheldon grabbed plaintiff's left hand. Plaintiff was able to free the hand and in the process, caused Sheldon to lose his balance and step away from plaintiff. Olson took out his handcuffs with his left hand and grabbed plaintiff's right wrist with his own right hand. Olson placed the handcuff on plaintiff's right wrist. Plaintiff freed his hand from Olson's grasp and struck Olson in the left temple. Olson once again gained control of plaintiff's right hand with his own right hand.

Sheldon used both hands to grab plaintiff's left wrist. Plaintiff attempted to knee Olson in the groin twice, causing Olson to fall backward to one knee near plaintiff's right side. Olson, on one knee, reached his left arm and shoulder around and behind plaintiff's right leg. Olson's left arm moved between plaintiff's legs, from rear to front. Olson's left hand was placed on the front of plaintiff's

---

**12.** Plaintiff was prosecuted in the County Court of Box Butte County for assaulting Linda Dyer and officer Olson. The charges were filed on March 19, 1992, and a judgment of conviction was entered September 15, 1992.

**13.** I note that the reconstruction of the events at the arrest scene would have been greatly simplified by the use of diagrams showing the location of the parties and witnesses on the property.

right thigh. Using the force of his left arm and shoulder, Olson moved plaintiff forward and upward, causing plaintiff's feet to leave the ground. Olson still held onto plaintiff's right arm which resulted in plaintiff's upper body being pulled downward as his lower body was moving forward and upward. Plaintiff's left hand was still held by Sheldon. Plaintiff struck the ground head-first. His head was tilted forward and struck the ground in the upper part of the forehead, forcing his head more violently forward and resulting in a flexion injury. Olson moved to plaintiff's right, landing on the ground beside plaintiff. Olson then regained a kneeling position over plaintiff's right leg, while plaintiff remained prone.

Olson finished handcuffing plaintiff. While on the ground in the front yard, plaintiff cried but did not complain of any injury. Olson and Sheldon carried plaintiff by his armpits, with feet dragging, across the street to the patrol car. There, plaintiff complained of back and neck pain and leg numbness. Olson and Sheldon then lowered him to the ground and called for the ambulance to return. The officers attempted to keep plaintiff stable until the ambulance returned. Plaintiff was then placed on a stretcher and taken for medical care. Neither officer hit or kicked plaintiff, either with or without weapons. The officers first became aware plaintiff was injured after they had moved him to the police car. When they learned of the injury, they attempted to keep him stationary and carried him no further.

### Use of Force Expert

Plaintiff called Brenda L. Urbanek as an expert in the field of law enforcement, specifically on the issue of use of force. Urbanek is a use of force instructor at the Nebraska Law Enforcement Training Academy. She testified that prospective law enforcement officers who attend the academy are taught specific techniques regarding use of force. She stated the academy teaches officers to evaluate the need for force through the use of a Level of Resistance [14] continuum and a Level of Control [15] continuum. The officer is taught to evaluate the amount of resistance the arrestee is demonstrating and use an appropriate level of control in response. The scales are roughly corresponding. Officers are taught that for each action by an arrestee, the officer may respond with force one level greater than the resistance.

After reviewing description of the arrest given by witnesses in two state court cases,[16] Urbanek concluded both arresting officers had utilized excessive force against plaintiff. She concluded plaintiff's actions constituted active aggression allowing defendants to employ either empty hand [17] or intermediate weapon control.[18] However, she testified defendants employed lethal force in arresting plaintiff; the determining factor in this conclusion was the extent of plaintiff's injuries. On cross examination, she stated that Olson's objective in attempting to control plaintiff's legs was proper, but she stated the end result of the execution of that objective was flawed, resulting in an excessive use of force.

When questioned by the court, Urbanek described the presumed facts underlying her conclusions. Her conclusion regarding Olson's actions stemmed from grabbing plaintiff's legs, taking him down, and allowing his head to strike the ground. Because of the lack of specificity in the state court testimony

---

**14.** The Level of Resistance continuum describes six categories in which arrestees may be classified depending on their actions while being arrested: (1) psychological intimidation; (2) verbal non-compliance; (3) passive resistance; (4) defensive resistance; (5) active aggression; and (6) aggravated active aggression.

**15.** The Level of Control continuum describes five categories of control techniques which may be used by law enforcement officers depending on the level of resistance displayed by the arrestee: (1) officer presence; (2) verbal direction; (3) empty hand control; (4) intermediate weapon; and (5) lethal force.

**16.** Plaintiff's arrest was a peripheral issue in two state cases. The first was a child custody case involving Linda Dyer and her ex-husband. The second case was plaintiff's criminal action for assault.

**17.** Empty hand control consists of blows to the arrestee made by an officer who has no weapon in hand.

**18.** Intermediate weapon control would include the use of mace, a baton, a stun gun or ordering a police dog to attack.

regarding this issue, she was uncertain of how the take-down or "tackle" took place; she "envisioned" Olson's arms around plaintiff's legs but did not know precisely where on the legs the arms were placed. When asked about the basis for her opinion that Sheldon had used excessive force, she changed her original opinion. Assuming that Sheldon had ahold of plaintiff's upper body and merely held onto plaintiff as they both fell, Urbanek determined that Sheldon acted properly. The only problem she perceived with Sheldon's actions was that he landed on plaintiff. Her final conclusion was that Sheldon had not used excessive force according to the Academy's scales. Based on her education, experience and training, I accept Urbanek's testimony as true to the extent it makes a determination as to the defendants' actions as expressed in the state court records when judged on the Academy's scales.

On August 7, 1991 when plaintiff was arrested, defendant Sheldon had not yet attended the Academy. Defendant Olson had attended the academy in 1981. The Levels of Resistance and Levels of Control scales were not taught in the academy training at that time. Olson was never taught the arrest techniques now taught by the academy in conjunction with these scales. While Olson had been involved in further training after leaving the Academy, through the use of seminars, videotapes, and continuing legal education in which he received a Bachelor of Arts in criminal justice, none of this later training discussed levels of resistance or control. Prior to this incident, Olson had made approximately 1000 arrests but only one prior arrest was resisted. When Olson was trained, he was taught that an appropriate response to an arrestee resisting in the manner plaintiff did was to use mace or make a "neck slash"[19] or calf strike with a baton. I accept Olson's statements that without frequent use and training, the techniques described by Urbanek would be unworkable in

reality. Split-second decisions must be made by an officer when an arrestee resists; responses must be almost second nature and would require frequent, repetitive training to be effective.

## CONCLUSIONS OF LAW

Plaintiff alleges he was seized and arrested in violation of the Fourth Amendment. He alleges defendant Sheldon arrested plaintiff by remaining in the trailer-home after Linda Dyer was taken by medical personnel to be examined.[20] Plaintiff also alleges the officers' use of force during the arrest was unreasonable in violation of the Fourth Amendment.

### 1. Fourth Amendment Seizure

As noted by the Eighth Circuit Court of Appeals in *Warren v. City of Lincoln,* 864 F.2d 1436 (8th Cir.) (en banc), *cert. denied,* 490 U.S. 1091, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989), the Supreme Court has identified three categories of police-citizen encounters, each justifying a different level of detention.

The first category consists of consensual communications between officers and citizens, involving no coercion or restraint of liberty. Such encounters do not constitute seizures and thus are beyond the scope of the fourth amendment. *See Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983). The second category is the so-called *Terry* stop, *see Terry v. Ohio,* 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *Florida v. Royer,* 460 U.S. at 498–99, 103 S.Ct. at 1324–25, pursuant to which an officer having a reasonable suspicion that a person has committed or is about to commit a crime may temporarily seize the person for limited investigative purposes. Finally, there are full-scale arrests, which must be supported by probable cause.

---

**19.** Olson described the "neck slash" as a technique whereby the arrestee is struck in the shoulder and neck area with a baton in an attempt to either pinch a nerve or break the clavicle.

**20.** Plaintiff does not claim Sheldon's warrantless entry into the trailer-home constituted a Fourth Amendment violation. Such a claim would be

meritless given the circumstances of Sheldon's entry. *See United States v. Riccio,* 726 F.2d 638, 643 (10th Cir.1984) (Fourth Amendment does not bar a warrantless entry when the officer has a reasonable belief that a person is in need of aid).

[*United States v. Poitier*, 818 F.2d 679, 682 (8th Cir.1987), *cert. denied*, 484 U.S. 1006, 108 S.Ct. 700, 98 L.Ed.2d 651 (1988).]

*Warren v. City of Lincoln*, 864 F.2d at 1438–39.

A police-citizen encounter escalates past the first category, and thus becomes a seizure, if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Peterson v. City of Plymouth*, 945 F.2d 1416, 1419 (8th Cir.1991), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980); *see also, Florida v. Bostick*, —— U.S. ——, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991). "A seizure is merely an investigatory stop, however, where 'the officer's action was justified at its inception, and . . . was reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* quoting *Terry v. Ohio*, 392 U.S. at 20, 88 S.Ct. at 1879.

■ To escalate the seizure from an investigatory to an actual arrest, the officer must have probable cause. *See Warren v. City of Lincoln, supra.* "Probable cause exists where the facts and circumstances within the arresting officers' knowledge are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." *United States v. Archer*, 840 F.2d 567, 573 (8th Cir.), *cert. denied*, 488 U.S. 941, 109 S.Ct. 365, 102 L.Ed.2d 354 (1988); *see also, Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 224, 13 L.Ed.2d 142 (1964); *United States v. Wajda*, 810 F.2d 754, 758 (8th Cir.), *cert. denied*, 481 U.S. 1040, 107 S.Ct. 1981, 95 L.Ed.2d 821 (1987).

■ The determination of whether defendants had "reasonable suspicion" and/or "probable cause" to seize plaintiff requires consideration of the totality of the circumstances as they were known by the officer at the time of the seizure. *See Buffkins v. City of Omaha*, 922 F.2d 465, 469 (8th Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 273, 116 L.Ed.2d 225 (1991), citing *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981) (reasonable suspicion); *United States v. Abadia*, 949 F.2d 956, 959 (8th Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1510, 117 L.Ed.2d 648 (1992), citing *Illinois v. Gates*, 462 U.S. 213, 230–32, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983) (probable cause).

■ When officer Sheldon arrived, he saw Linda Dyer sitting on the bathroom floor in pain; the pain was severe enough to require medical attention. She was holding her ribs and crying. Before leaving, Linda was adamant that someone stay in the house to ensure the safety of the children. Plaintiff remained in the house waiting for Linda to return. Sheldon and Yardley also remained in the house. Even assuming plaintiff was seized at that time, Sheldon had at least reasonable suspicion that plaintiff had assaulted his wife. Although Sheldon remained near plaintiff during the time Linda was gone, he did not tell plaintiff he was under arrest. In fact, a number of times he requested plaintiff leave the house and go elsewhere. Certainly, a reasonable person would not believe he was under arrest when an officer makes clear that the person may leave the premises. Any seizure taking place while plaintiff waited for Linda to return was merely investigatory and was adequately supported by articulable, reasonable suspicion that plaintiff had assaulted his wife.

■ When Linda returned, plaintiff talked to her. Sheldon also talked to her and was informed her injuries were caused by plaintiff. At that time, Sheldon had probable cause to arrest plaintiff for assaulting his wife. Sheldon then called for backup from defendant Olson. When Olson arrived, Sheldon informed plaintiff he was under arrest. At that time, plaintiff was not free to leave and reasonably concluded he was under arrest. From the totality of the circumstances, Sheldon had probable cause to support the arrest. Therefore, neither defendant Sheldon nor defendant Olson violated plaintiff's Fourth Amendment rights based their decision to arrest him. Plaintiff failed to demonstrate by a preponderance of the evidence that defendants seized him without reasonable suspicion or probable cause. Therefore, I shall grant defendants' motion for judgment pursuant to *Fed.R.Civ.P.* 52(c), and I

shall enter judgment for defendants on this claim.

## 2. Excessive Force

■ The Supreme Court has held that § 1983 excessive force claims arising in the context of an arrest must be analyzed under the Fourth Amendment's reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). *Graham* represented a departure from the law of many circuits which examined such claims under the substantive due process test enunciated in *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973). While the substantive due process test focuses on whether the arresting officers acted "maliciously or sadistically," the Fourth Amendment standard is entirely objective. *See Robinson v. City of St. Charles*, 972 F.2d 974, 976 (1992). The Supreme Court stated,

> As in other Fourth Amendment contexts ... the "reasonableness" inquiry in an excessive force claim is ... whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation.... An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Graham v. Connor*, 490 U.S. at 397, 109 S.Ct. at 1872 (citations omitted).

■ The reasonableness of an action is to be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396, 109 S.Ct. at 1872. The application of the test must turn on the facts of the case and depends on such facts as the severity of the crime, whether the suspect poses an immediate threat to the safety of the officers or others and whether the suspect is actively resisting arrest or attempting to evade arrest. *Id.* The Eighth Circuit Court of Appeals applied these factors in *Gainor v. Rogers*, 973 F.2d 1379 (8th Cir.1992).

In *Gainor*, police arrested a man who was carrying a cross through the town on a religious mission. When asked for identification, the man refused. The plaintiff's complaint alleged the officers, "violently grabbed him, tackled him, threw him face-down on the pavement, forcibly handcuffed him and placed him under arrest." *Id.* at 1385. Appealing a denial of a summary judgment motion, the officers alleged they were entitled to qualified immunity, alleging the plaintiff had resisted arrest, making their actions objectively unreasonable. The Court disagreed.[21] Finding the alleged crime "neither violent nor serious," the lack of evidence demonstrating the plaintiff posed a physical threat to anyone and a dispute in the evidence as to whether he was resisting arrest, the court could not conclude defendants had used reasonable force as a matter of law. *Id.* at 1388.

In this instance plaintiff was being arrested for assaulting his wife,[22] a Class I misdemeanor. *See Neb.Rev.Stat.* § 28–310. The evidence did not demonstrate plaintiff posed a physical threat to anyone but the officers. Although plaintiff stated he intended to return inside the house to speak with his wife, I find the threat of harm to her to be small. Other than the officers, a number of EMT's remained. Although plaintiff had struck his wife earlier in the evening, I find no evidence that he was likely to do so after she had returned from the medical clinic. While a potential threat may have existed, I find it remote and of insufficient weight to be determinative of the reasonableness of the officers' actions.

The final portion of the *Graham* test is whether plaintiff was resisting arrest. As stated earlier, plaintiff pulled away from both defendants, punched Olson and attempted to

---

21. Although one judge filed a dissenting opinion, he agreed the officers were not entitled to summary judgment on the excessive force claim. *Gainor v. Rogers*, 973 F.2d at 1391, (Loken, J., dissenting).

22. Plaintiff was later also charged with assaulting Olson because of the punch plaintiff landed to Olson's temple. This assault took place before defendants used any of the force about which plaintiff complains.

strike him with a knee twice. At that time, he knew he was being placed under arrest and therefore must have known he was resisting arrest. Plaintiff had been told by two uniformed officers he was under arrest. In fact, he asked Olson if he was under arrest, and Olson replied in the affirmative. Plaintiff could not have been under a mistaken belief that the officers were acting in anything but their official capacity in placing him in custody. Nonetheless, plaintiff fought the officers' actions. While the officers never punched or kicked plaintiff, he initiated the attacks by pulling his hands away to avoid being cuffed, punching Olson and attempting to strike him with a knee.

*Graham* does not purport to provide an exhaustive list of the factors to be considered in an arrest situation. The Eighth Circuit Court of Appeals has stated, for instance, that the extent of injury is relevant to determine how much force was used. *Foster v. Metropolitan Airports Comm'n,* 914 F.2d 1076, 1082 (8th Cir.1990).[23] In this vein plaintiff alleges the officers used an unreasonable amount of force as indicated by the extent of the plaintiff's injuries. He argues that his injuries demonstrate that tremendous force must have been used when his head was forced into the ground.

■ Even assuming that such evidence should be considered, plaintiff failed to demonstrate that defendant Sheldon acted unreasonably during the arrest. Defendant Sheldon's sole contact with plaintiff prior to plaintiff's injury was twice taking hold of plaintiff's left wrist. The first time Sheldon grabbed plaintiff's wrist, plaintiff broke free. Sheldon then grabbed the wrist for a second time. At that time, plaintiff went to the ground. Sheldon did not cause plaintiff to go to the ground, nor was any evidence presented that Sheldon knew plaintiff was going to go to the ground. Sheldon simply held onto plaintiff's arm in an attempt to control a man who was resisting arrest. Such actions can in no way be construed as unreasonable giv-

en the circumstances. I conclude plaintiff's claim against defendant Sheldon is without merit.

■ Plaintiff's claim against defendant Olson however, is a closer case. Olson's takedown was clearly the cause of plaintiff's injuries. The *Graham* factors described above apply to Olson's situation with equal force as they did with Sheldon's. The subject of liability, then, turns on whether Olson's takedown of plaintiff was objectively reasonable given the reason for the arrest and the extent of plaintiff's resistance.

Essentially, plaintiff claims the extent of his injury is the most important evidence in the analysis because it demonstrates how much force Olson must have used when taking plaintiff to the ground. In support of his claim against Olson, plaintiff relies heavily on the testimony of Urbanek who stated that the force used by Olson was excessive by Academy standards. Urbanek's conclusion was based predominantly on the extent of plaintiff's injuries. She stated that because plaintiff was paralyzed by the action, Olson had used lethal force in arresting plaintiff. She reached this conclusion despite the uncontroverted evidence that Olson used no weapons and did not strike plaintiff at any time.

Although Urbanek's testimony was relevant, and helpful, it is not dispositive. Urbanek testified that the excessive force analysis now taught by the Academy, and utilized by her in reaching her conclusion in this case, was not taught in the Academy until 1986. Olson attended the academy prior to that time. No evidence was presented that Olson, or any other officer who attended the Academy prior to 1986, was taught to analyze an arrest situation in the method described by Urbanek. Nor was evidence presented that such officers would have access to such training without returning to the Academy after 1986. Plaintiff has directed this court to no constitutional duty of an officer to repeatedly

---

**23.** This Eighth Circuit holding seems questionable in light of the Supreme Court's rejection of the *Glick* test. That test relied, in part, on the extent of the injury to determine the officer's subjective intent. Although *Foster* was decided after *Graham* and uses a reasonableness analysis,

it supports its reliance on the extent of the injury on a pre-*Graham* case, *Agee v. Hickman,* 490 F.2d 210, 212 (8th Cir.), *cert. denied,* 417 U.S. 972, 94 S.Ct. 3178, 41 L.Ed.2d 1143 (1974). Nonetheless, *Foster* is circuit precedent and must be accepted as good law.

be trained by the state whenever new teaching techniques are implemented. Thus, plaintiff has not demonstrated Olson knew or should have known of the training techniques, or should be held to a standard employing them.

Plaintiff must demonstrate that a reasonable officer at the scene of the arrest would have viewed the force applied during the arrest as unreasonable. *Graham v. Connor*, 490 U.S. at 396, 109 S.Ct. at 1872. Urbanek's testimony in this case was insufficient to demonstrate what a reasonable officer would conclude while at the scene. The Supreme Court expressly cautioned against reliance on the "20/20 vision of hindsight." *Id.* Further, the Court stated

> The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

*Id.* at 396–97, 109 S.Ct. at 1872.

Urbanek's conclusion was made from an academic viewpoint, relying on two separate scales which must be compared and constantly reevaluated as the arrestee's conduct changes and the officer takes in further information about the circumstances. While such a scholastic exercise may be appropriate as a guide in the classroom, I cannot conclude the Constitution's reasonableness standard required it in the "tense, uncertain and rapidly evolving" setting of this arrest. To give meaning to *Graham's* words of warning that split-second judgments must take place during an arrest, the evaluation of reasonableness must extend beyond the Academy's level of force analysis, especially to an officer who was trained at the same Academy in the use of a different arrest/force analysis.

Plaintiff claims a reasonable officer would have chosen a different method to take control of plaintiff. Through Urbanek, plaintiff suggested a number of options remained open to Olson when faced with plaintiff's resistance. Urbanek suggested a kick to one of plaintiff's ankles or an arm bar [24] would have been appropriate given the circumstances. I do not find such actions realistic in the already-deteriorated situation confronting the officers at the moment they applied force. Olson had been punched was on the ground when he grabbed plaintiff's leg and made the take-down.[25] An ankle kick seems impossible from that position, as does an arm bar. Further, although perhaps less likely, there is no guarantee that forcing plaintiff to the ground through the use of an arm bar would not have resulted in similar injuries; use of the arm bar requires the control of one arm [26] and would have forced plaintiff to the ground face-first. Urbanek testified the determining factor in her conclusion that Olson applied lethal force was the extent of plaintiff's injuries, despite her opinion that Olson's objective was proper. Had plaintiff received similar injuries through one of the techniques Urbanek proposed, her testimony seems to lead to the conclusion that Olson would again have used lethal force in effecting the arrest. Thus, his actions would constitute excessive force as determined by the Academy's scales.

After being struck by plaintiff, Olson was on the ground next to plaintiff's knee. Making a "split-second judgment," he sought to take control of plaintiff. No one disputes that gaining control over a person resisting arrest is a proper objective, nor that taking plaintiff to the ground was a proper way to achieve that control in this case. From his position, Olson took a logical course to carry out the objective. He used what momentum and leverage he had available from his position on one knee and forced plaintiff to the

---

**24.** An arm bar consists of the officer holding one of the arrestee's arms at the wrist with the palm facing upward. The arm is raised and brought forward forcing the arrestee to the ground face-first.

**25.** According to officer Sheldon, according to the Academy's curriculum, both officers were too close to plaintiff in effecting the arrest; they should have remained a short distance—but out-

side arm's or leg's length—away from plaintiff and ordered his compliance with verbal commands first, to avoid being struck and placed out of position.

**26.** One must keep in mind that defendant Sheldon was holding the plaintiff's left arm at this time.

ground. Once plaintiff was on the ground Olson used no further force. He did not punch or kick plaintiff; he did not use any weapons to injure plaintiff. The take-down was the only force used against plaintiff even though the method of carrying out the take-down was not in keeping with current teaching.

The Eighth Circuit recently stated,

"The Constitution ... requires only that the seizure be objectively reasonable, not that the officer pursue the most prudent course of conduct as judged by 20/20 hindsight vision."

*Cole v. Bone,* 993 F.2d 1328, 1334 (8th Cir. 1993), citing *Graham v. Connor,* 490 U.S. at 396, 109 S.Ct. at 1872. The evidence in this case leads me to the conclusion that plaintiff failed to demonstrate that Olson used unreasonable force in carrying out the arrest.

■ Further, I conclude both officers acted reasonably when carrying plaintiff to the patrol car. As soon as plaintiff made them aware his legs were numb they lowered him to the ground and attempted to hold him in a stable position. Because the officers were unaware of plaintiff's injuries until they reached the patrol car, their actions cannot be described as unreasonable under the Fourth Amendment. In sum, plaintiff has failed to demonstrate by a preponderance of the evidence that either officer acted unreasonably, in violation of the Fourth Amendment, when they arrested him. Accordingly, I shall enter judgment for the officers on this claim.

### 3. Municipal Liability

■ Plaintiff alleges the village of Hemmingford is liable for plaintiff's injuries because: (1) it hired defendant Sheldon with knowledge that he had previously been convicted of an assault, and (2) it failed to properly train the officers in how to properly carry out an arrest. To hold the village of Hemmingford liable in this action, plaintiff must first demonstrate that at least one of the officers violated his constitutional rights,

and second that the village was deliberately indifferent to these rights. *Collins v. City of Harker Heights,* —— U.S. ——, ——, 112 S.Ct. 1061, 1061, 117 L.Ed.2d 261 (1992), citing *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1204, 103 L.Ed.2d 412 (1989);[27] *see also Robinson v. City of St. Charles,* 972 F.2d 974, 977 (8th Cir.1992); *Roach v. City of Fredericktown,* 882 F.2d 294, 297–98 (8th Cir.1989).

Plaintiff has failed to demonstrate that either officer violated plaintiff's Fourth Amendment rights. Without the existence of an underlying constitutional violation, his claims against the village of Hemmingford must fail. Even if plaintiff had demonstrated one of the officers had violated plaintiff's Fourth Amendment rights, he would be unable to prevail on his failure to train claim against the village because he failed to demonstrate the village was deliberately indifferent to his constitutional rights. In *City of Canton v. Harris, supra,* the Court stated, "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Id.* at 390–91. An isolated incident in which an individual is subjected to excessive force is insufficient to demonstrate a municipality is liable for failure to train. *See Oklahoma City v. Tuttle,* 471 U.S. 808, 823–23, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985) (plurality); *Wedemeier v. City of Ballwin,* 931 F.2d 24, 26 (8th Cir.1991).

Plaintiff failed to demonstrate that either officer violated his Fourth Amendment rights by using excessive force during the arrest. Further, he failed to prove that the village of Hemmingford was deliberately indifferent to his safety. Therefore, plaintiff's claims against the village are without merit. Accordingly, I shall enter judgment for the village.

### CONCLUSION

Plaintiff has failed to prove by a preponderance of the evidence that defendants vio-

---

**27.** The Court made clear in both *Collins* and *Harris* that the "deliberate indifference" standard applied regardless of the nature of the underlying constitutional claim. *See Collins,* ——

U.S. at —— fn. 7, 112 S.Ct. at 1061 fn. 7 (due process); *Harris,* 489 U.S. at 388 fn. 8, 109 S.Ct. at 1205 fn. 8 (Fourth Amendment excessive force).

lated his Fourth Amendment rights when they placed him under arrest or by using excessive force during the arrest. Further, his claims against the village of Hemmingford are without merit for the failure to demonstrate the violation of any constitutional rights. I shall grant defendants' motion for judgment on the first claim pursuant to Rule 52(c), and order judgment for the defendants on the remaining claims.

### JUDGMENT

IT IS ORDERED, in accordance with the memorandum of decision filed this day, judgment in this matter hereby is entered for defendants.