**Lu Ann BUFFKINS, Appellant,**

v.

**CITY OF OMAHA, DOUGLAS COUNTY, NEBRASKA, a Municipal Corporation; Alvin Grigsby; and, John Friend, Appellees.**

**No. 90–1319.**

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1990.

Decided Dec. 28, 1990.

Rehearing and Rehearing En Banc Denied Feb. 15, 1991.

Mary P. Clarkson, Omaha, Neb., for appellant.

Jim Fellows, Omaha, Neb., for appellees.

Before LAY, Chief Judge, FAGG, Circuit Judge, and LARSON,* Senior District Judge.

LAY, Chief Judge.

Lu Ann Buffkins brought suit against the City of Omaha and two Omaha police officers, Alvin Grigsby and John Friend, for deprivation of her constitutional rights under Title 42 section 1983 of the Civil Rights Act.[1] The suit arose out of an alleged illegal search and seizure and wrongful arrest. The complaint also challenged the constitutionality of a disorderly conduct ordinance of the City of Omaha under which the arrest was allegedly made. Buffkins also claimed she had been discriminated against because of her race in violation of section 1981.[2]

At the close of Buffkins' case in chief the district court[3] concluded that there was insufficient evidence that the City of Omaha had any policy or custom that would subject it to liability under either section 1981 or 1983 and therefore dismissed the City of Omaha from the case. The district court also found no evidence of racial discrimination and therefore dismissed plaintiff's claim under section 1981. The district court further ruled as a matter of law that the officers did not illegally seize

---

* The HONORABLE EARL R. LARSON, Senior United States District Judge for the District of Minnesota, sitting by designation.

1. Section 1983 provides as follows:
   Every person who, under color of [state law] ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law ... for redress.
   42 U.S.C. § 1983 (1988).

2. Section 1981 states:

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to ... sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens.
42 U.S.C. § 1981 (1988).

3. The Honorable John B. Jones, United States District Judge for the District of South Dakota, sitting by designation.

Buffkins and accordingly directed a verdict on behalf of the defendants on plaintiff's Fourth Amendment claim. Buffkins' motions for directed verdict and judgment notwithstanding the verdict were overruled. The court submitted the state pendent claims of false arrest, false imprisonment, malicious prosecution, and intentional infliction of emotional distress to the jury. The jury returned a verdict in favor of the defendant officers.

We affirm the district court's dismissal of plaintiff's claim under section 1981. We otherwise reverse and remand for a new trial all of plaintiff's other claims. We also order the reinstatement of plaintiff's claim against the City of Omaha.

## FACTS

On March 17, 1987, Omaha police received a tip that cocaine would be imported into the Omaha area before 5:00 p.m. by a black person or persons arriving on a flight from Denver. Officers Grigsby and Friend planned to meet at the Omaha airport to follow up on the tip. Both officers had a working knowledge of the "drug courier profile"[4] and Grigsby had received special training from the Drug Enforcement Agency ("DEA") concerning interception of drug couriers in airports. Officer Grigsby expressed concern over the vagueness of the tip but decided to proceed to the airport to meet Friend.

The officers, dressed in plain clothes, met at the airport at approximately 2:30 p.m. The officers decided to monitor a flight that was scheduled to arrive from Denver at 3:40 p.m. The flight the officers watched was approximately one-half hour late. While surveying the deplaning passengers, the officers noticed Buffkins, the only black person exiting the plane. Buffkins was met by her sister, Hollis, at the gate. The officers later claimed that Hollis

appeared nervous. Buffkins' other sister, Cheryl Nwachakwu, joined Buffkins and Hollis near the escalator leading down to the baggage carousel. The officers noticed that Buffkins carried a teddy bear with seams that appeared to have been resewn. Buffkins handed the teddy bear to Nwachakwu. Hollis left the airport without taking the teddy bear with her.

Grigsby approached Buffkins and Nwachakwu, identified himself as an officer conducting a narcotics investigation, and upon Buffkins' request presented identification. Grigsby and Friend then requested Buffkins to bring her luggage and come with them to answer questions. Nwachakwu was told she could leave. When Buffkins asked the officers who they were looking for, the officers told her about the tip.

The officers picked up two of Buffkins' suitcases and escorted Buffkins and Nwachakwu to an office located on the other side of the terminal. On the way to the office, Buffkins protested that the officers' conduct was racist and unconstitutional. Buffkins claims that she believed she had no choice but to cooperate with the officers' investigation and that neither officer told her she was free to go. Inside the security room, Buffkins gave the officers her driver's license and airline ticket, neither of which were suspicious. When Friend kneaded and felt the teddy bear, he did not detect any indication of contraband. Buffkins allegedly became increasingly loud during the interrogation. When the officers asked Buffkins if they could search her luggage, she refused, citing her rights under the Fourth Amendment. The officers eventually informed Buffkins that she was free to go and told her to "have a nice day," to which she replied "asshole system" or "I will have a nice day, asshole."[5] The officers then decided to arrest Buffkins for disorderly conduct.[6]

---

4. The drug courier profile is an informal compilation of characteristic behaviors believed to be typical of persons carrying unlawful narcotics. *Reid v. Georgia*, 448 U.S. 438, 440, 100 S.Ct. 2752, 2753, 65 L.Ed.2d 890 (1979) (per curiam).

5. Buffkins testified that she said the words "asshole system." Jt.App. at 82. Officer Friend

testified that Buffkins said "I will have a nice day, asshole." Jt.App. at 202. Officer Grigsby and Nwachakwu heard only the word "asshole." Jt.App. at 242.

6. Buffkins was then taken to Central Headquarters, booked and released on bond. On May 4, 1987, she returned to Omaha to defend

When the officers told Buffkins they would have to confiscate her luggage and inventory it, Buffkins refused. The officers then allowed Nwachakwu to open and inspect Buffkins' luggage in their presence. It is undisputed that Buffkins was not carrying any drugs or contraband.

Both officers testified that Buffkins did not fit the drug courier profile and that they did not rely on the profile as a basis to stop Buffkins.[7]

## ANALYSIS

### I. Race Discrimination

■ Buffkins contends that the officers violated 42 U.S.C. § 1981 (1988) because they detained her solely on the basis of her race. We disagree.

Buffkins failed to show that the officers' actions were racially motivated by purposeful discrimination. *See General Bldg. Contractors Ass'n v. Pennsylvania,* 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982); *Washington v. Simpson,* 806 F.2d 192, 197 (8th Cir.1986). The officers admittedly identified Buffkins in part because of her race. We conclude, however, that the officers' identification of Buffkins' was reasonable and nondiscriminatory in light of the fact that her race matched the racial description of the person described in the tip. *See United States v. Bautista,* 684 F.2d 1286, 1289 (9th Cir. 1982) (police may detain a person for further investigation when, together with other relevant facts, the person's race matches the racial description of persons suspected of criminal activity), *cert. denied,* 459 U.S. 1211, 103 S.Ct. 1206, 75 L.Ed.2d 447 (1983).[8]

### II. Fourth Amendment Claim

Buffkins argues that the district court erred by directing a verdict in favor of the police officers on the ground that they had a reasonable and articulable suspicion to detain her at the airport. We agree. We hold as a matter of law that the seizure of Buffkins by the police officers was illegal and violative of the plaintiff's constitutional right to be free from an unreasonable search and seizure. Thus, Buffkins is entitled to redress under 42 U.S.C. § 1983.

### A. "Seizure"

■ Not all encounters between police officers and citizens involve "seizures" of persons within the meaning of the Fourth Amendment. *See, e.g., Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1323, 75 L.Ed.2d 229 (1983) (recognizing that officers do not violate the Fourth Amendment simply by approaching an individual in a public place and asking the individual to answer some questions); *United States v. Mendenhall,* 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980). The Fourth Amendment's proscription against unreasonable seizures is implicated, however, if an "officer, by means of physical force or show of authority, ... in some way restrain[s] the liberty of a citizen." *Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, n. 16, 20 L.Ed.2d 889 (1968). In *United States v. Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1876, a plurality of the Supreme Court held that a person is seized "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."

The defendants argue that Buffkins voluntarily consented to be taken from the main terminal to a private office for a search and further questioning. The record refutes this claim.[9] Buffkins pro-

---

herself against the charge of disorderly conduct and was found not guilty.

**7.** Unlike many individuals who fit the "drug courier profile," Buffkins was neither the first nor the last passenger to deplane, she did not pay cash for her plane ticket, and she was not making a quick turn-around trip. Moreover, she had identification that was consistent with her airline ticket, she checked her luggage, and

she did not arrive on an early flight when few police are present.

**8.** We note, however, that our conclusion would be very different if the officers, acting without a tip, focused their investigation on Buffkins solely because of her race. *See infra* note 12.

**9.** Buffkins testified that the officers informed her that they needed her to come with them and told her to bring her bags. Jt.App. at 65. She

tested the search and the questioning, accusing the officers of racial bias. Although Buffkins went to the office willingly, this fact does not establish any more than acquiescence to authority, not voluntary consent. *See Florida v. Royer,* 460 U.S. at 497, 103 S.Ct. at 1323 (State's burden of showing that the necessary consent was freely and voluntarily given is not satisfied by merely showing submission to a claim of lawful authority).

We conclude that the initial consensual encounter between Buffkins and the officers became a seizure at least at the point when the officers requested Buffkins to accompany them to the office. The officers at that time seized her luggage. In addition, the officers specifically asked Buffkins to accompany them to the office but they informed her sister Nwachakwu that she was free to go.[10] A reasonable person would reasonably infer from the officers' conflicting statements to her and Nwachakwu that she had no choice but to go with the officers. Under the existing circumstances, Buffkins could not have reasonably believed that she was free to leave. The officers concede they never told Buffkins that she was free to leave. Although a seizure does not automatically occur if an officer does not inform a detainee that he or she is free to leave, the absence of such notice may imply that the detainee is being restrained. *Florida v. Royer,* 460 U.S. at 501, 103 S.Ct. at 1326.

Moreover, Buffkins' protestations that the officers' conduct was racist and unconstitutional and the officers' actions in picking up her luggage reinforces our belief that Buffkins reasonably believed she was seized for the purposes of the Fourth Amendment.[11]

### B. Reasonable Articulable Suspicion

For the seizure of Buffkins to be constitutional under the Fourth Amendment, the officers must have had a reasonable articulable suspicion that she had committed or was about to commit a crime. *See Terry v. Ohio,* 392 U.S. at 21, 88 S.Ct. at 1879. Reasonable suspicion must be formed before the seizure occurs. Although the officers did not need to have probable cause before they seized Buffkins, they must have had more than an unparticularized hunch or suspicion that she was importing cocaine into the Omaha area. *Id.* at 27, 88 S.Ct. at 1883. To determine whether reasonable suspicion exists, it is necessary to consider the totality of the circumstances. *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981). In *United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 1586–87, 104 L.Ed.2d 1 (1989), the Supreme Court recognized that under certain circumstances, "wholly lawful conduct might justify the suspicion that criminal activity was afoot" depending upon the

---

stated that she never agreed nor wanted to go with the officers but that she followed the officers because she felt she was "supposed to do what [they] asked [her to do] as long as it [was] not something illegal." *Id.* She also stated that she did not believe she could leave at that point because she feared a "physical altercation" with the officers. *Id.* at 65–6. She testified that each of the officers picked up a bag and escorted her and her sister to the office on the other side of the terminal. *Id.* at 66. The officers walked directly behind the two women and carried the luggage with their outside hand. *Id.* Moreover, Officer Friend testified that Buffkins was "abusive and confrontational the entire time that she was with us." *Id.* at 378.

**10.** Buffkins testified as follows: "I was told that I and my baggage had to go with Officer Grigsby and Officer Friend. At that time they turned to my sister Cheryl and they told Cheryl that she could leave, if she wanted to." Jt.App. at 117.

**11.** The facts in *United States v. Drinkard,* 900 F.2d 140 (8th Cir.1990), are similar to the facts in the present case. In *Drinkard,* the DEA received a tip that a person with Drinkard's characteristics would smuggle drugs into Kansas City from Houston by air. When the officers saw Drinkard at the airport, they approached him, asked him if he had any drugs in his bag, told him they were attempting to stop drugs from entering the Kansas City airport and asked him if they could search his luggage. One agent identified himself twice as a DEA agent and Drinkard was never told that he was free to leave. We held that Drinkard was subjected to a *Terry*-type investigative stop. *Id.* at 142. As in *Drinkard,* the officers in the present case did not tell Buffkins she could leave, they identified themselves as officers conducting a narcotics investigation, and they asked Buffkins if they could search her luggage.

"degree of suspicion that attaches to particular types of noncriminal acts."

■ After viewing the totality of the circumstances in the present case, we find the record totally devoid of *any* facts or circumstances that would permit a finding that the officers possessed a reasonable articulable suspicion that Buffkins was carrying drugs into the Omaha area. Both officers testified that Buffkins did not have any of the characteristics common to drug couriers. The officers stopped Buffkins solely because her race fit the racial description of the person described in the tip. Contrary to the district court's holding, Buffkins' race, apart from any other information known to the officers, clearly could not create a reasonable and articulable suspicion of criminal activity.[12] Innocent travellers cannot "be subject to virtually random seizures" merely because of their race. *See Reid v. Georgia,* 448 U.S. at 441, 100 S.Ct. at 2754. The officers could not have narrowed their suspicion to a particular individual based on the tip alone. The tip was very indefinite in that it did not state how many individuals on the flight were involved in the illicit activity or give a physical description of the sex, height, weight, clothing, or other characteristics of the person[s] who would be carrying the drugs. In order to constitute a reasonable articulable suspicion the known facts must reasonably relate to the person about to be stopped and demonstrate a reasonable suspicion that the person has engaged or will engage in criminal activity. The officers also assert that prior to their approach of Buffkins, they noticed that Buffkins was carrying a teddy bear with seams that appeared to have been resewn. However, this additional fact cannot create a reasonable articulable suspicion. There is nothing suspicious about a passenger deplaning an airplane carrying a toy animal. Furthermore, Hollis left the airport without taking the bear with her. Officer Friend specifically testified at trial that a drug courier would have wanted to get the teddy bear out of the airport as soon as possible if it contained drugs.[13]

■ "Based upon the whole picture, [the officers could not have] ... reasonably surmise[d] that ... [Buffkins] was engaged in criminal activity." *Cortez,* 449 U.S. at 421–22, 101 S.Ct. at 696–97. Thus, we conclude that the officers did not, as a matter of law, possess any reasonable articulable suspicion to detain Buffkins in the manner described. We hold the district court erred in directing a verdict for the police officers on Buffkins' Fourth Amendment claim.[14]

## III. Unlawful Arrest

The officers arrested Buffkins for violating section 20–42 of the Omaha disorderly conduct ordinance which provides as follows:

It shall be unlawful for any person purposely or knowingly to cause inconvenience, annoyance or alarm or create the

12. In *United States v. Taylor,* 917 F.2d 1402 (6th Cir.1990), Taylor, a black individual, was detained by three plainclothes officers at the Memphis International Airport. At the time Taylor was stopped, he was the only black person who had deplaned a flight arriving from Miami, Florida. At the evidentiary hearing, one of the officers who detained Taylor testified that seventy-five percent of the people that the drug task force follows are black. *Id.* at 1409. The Sixth Circuit held that the detention was unlawful. *Id.* at 1409. The court noted that "the agents were more apt to stop Taylor because of his race" and that it could not "allow blacks and other minorities to become subject to unreasonable stops and governmental intrusions in airports because of their race." *Id.* at 1409.

13. The defendants also argue that they believed that Hollis appeared nervous while waiting for the plane to land. Nervousness alone, however, would not have supplied the officers with the suspicion necessary for a *Terry*-type stop. *See United States v. Andrews,* 600 F.2d 563, 566 (6th Cir.) (nervousness is entitled to *no* weight because it is consistent with behavior of innocent airport travellers), *cert. denied,* 444 U.S. 878, 100 S.Ct. 166, 62 L.Ed.2d 108 (1979); *United States v. Gooding,* 695 F.2d 78, 84 (4th Cir.1982).

14. In a section 1983 action, the jury decides whether or not an individual has been seized within the meaning of the Fourth Amendment only if reasonable persons could differ on the conclusions to be drawn from the evidence. *See Pliska v. City of Stevens Point, Wisconsin,* 823 F.2d 1168, 1177 (7th Cir.1987). In the present case, however, no evidentiary facts exist which validate the officers' conduct in making the seizure and search.

risk thereof to any person by: (a) Engaging in fighting, threatening or violent conduct; or (b) Using abusive, threatening or other fighting language or gestures; or (c) Making unreasonable noise. Omaha Mun.Code § 20–42. Buffkins contends her arrest was unlawful because the officers could not have reasonably believed that they had probable cause to arrest her for using fighting words. She also argues that the City of Omaha was improperly dismissed as a defendant in this lawsuit because the City was partly responsible for her unlawful arrest.

A. Dismissal of the City of Omaha

■ Buffkins argues the district court erred by dismissing the City of Omaha as a defendant. She contends that her unlawful arrest was caused in part by the City's failure to repeal subsection (c) of the Omaha disorderly conduct ordinance. *See City of Canton v. Harris,* 489 U.S. 378, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) (holding that a municipality may be liable under 42 U.S.C. § 1983 if there is a direct causal connection between a municipal policy or custom and the alleged constitutional deprivation). We agree.

In 1985, the Nebraska Supreme Court observed that subsection (c) of the disorderly conduct ordinance was "unconstitutionally suspect" but held that in the particular case the defendant lacked standing to challenge the subsection. *State v. Groves,* 219 Neb. 382, 385, 363 N.W.2d 507, 510 (1985). Four years later, the United States District Court for the District of Nebraska declared the unreasonable noise subsection of the Omaha disorderly conduct ordinance (subsection (c)) unconstitutional. *Langford v. City of Omaha,* 755 F.Supp. 1460 (1989). The court reached the "inescapable" conclusion:

that the instant ordinance, using no more than the word 'unreasonable' to define what noise is prohibited and being void of indication as to whose sensitivity shall measure a violation lacks that definiteness, both in notice of what conduct is prescribed and in establishment of guidelines for enforcement which precedent has firmly declared to be essential.

*Langford v. City of Omaha,* CV. 86-0-331 (quoting Magistrate's Findings and Recommendations, slip op. at 13). Based on the holding in *Langford v. City of Omaha,* the trial court in the present case declared section 20–42(c) of the Omaha disorderly conduct ordinance unconstitutional and granted Buffkins' summary judgment motion with respect to her claim that section 20–42(c) is facially unconstitutional. At the time of Buffkins' arrest, the City of Omaha had not repealed subsection (c) of the disorderly conduct ordinance even though the Nebraska Supreme Court had questioned the constitutionality of that subsection approximately two years before Buffkins was arrested. Moreover, when the Nebraska federal district court finally declared section 20–42(c) unconstitutional, it relied on caselaw that clearly predated the arrest of Buffkins. In addition, at the time of Buffkins' arrest, several other federal courts had held statutes or ordinances with provisions similar to subsection (c) of the Omaha disorderly conduct ordinance unconstitutional. *See, e.g., Pritikin v. Thurman,* 311 F.Supp. 1400, 1402 (S.D.Fla.1970); *Original Fayette County Civic & Welfare League, Inc. v. Ellington,* 309 F.Supp. 89, 92 (W.D.Tenn.1970). As a result of the City's failure to repeal subsection (c), Officers Friend and Grigsby relied on the unconstitutional portion of the disorderly conduct ordinance to arrest Buffkins.[15] We

---

**15.** Under the circumstances, we find the record undisputed that the officers arrested the plaintiff under the unconstitutional subsection of the ordinance. Officer Friend testified at trial that he arrested Buffkins for violating the "fighting words" subsection *and* the "unreasonable noise" subsection of the disorderly conduct ordinance. He testified as follows: "during the entire time she was in that room, she spoke several octaves higher than the average conversational tone, and I took that into consideration upon arrest-

ing her for calling me an 'asshole.'" Jt.App. at 206. Friend also admitted that he considered it "abusive" that she was loud and vigorous and used certain mannerisms while she advocated her constitutional rights. Jt.App. at 386.

Officer Grigsby also testified at trial that he assisted and concurred in the arrest because Buffkins used the word asshole and exhibited a loud attitude throughout the interview. Jt.App. at 242. He admitted that Buffkins' loud attitude

therefore hold the City of Omaha was improperly dismissed as a party defendant in this lawsuit.

### B. Fighting Words

■ Buffkins also argues the district court should have found as a matter of law that the arresting officers could not have reasonably concluded that they had probable cause to arrest her for using a "fighting word." We agree.

The Supreme Court held in *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572, 62 S.Ct. 766, 769, 86 L.Ed. 1031 (1942), that "fighting words" are not protected speech under the First and Fourteenth Amendments. The *Chaplinsky* Court defines "fighting words" as words "which by their very utterance inflict injury or tend to incite an immediate breach of the peace." *Id.* "Fighting words" are words that are "likely to cause an average addressee to fight." *Id.* at 573, 62 S.Ct. at 770. Based on the holding in *Chaplinsky*, the Nebraska Supreme Court construed subsections (a) and (b) of the Omaha disorderly conduct ordinance as prohibiting fighting words or conduct. *State v. Groves*, 219 Neb. 382, 385, 363 N.W.2d 507, 510 (1985).

We conclude that the district court should have found as a matter of law that the officers did not have probable cause to arrest Buffkins for using "fighting words."[16] *See Cavazos v. State*, 455 N.E.2d 618 (Ind.1983) (holding as a matter of law that calling a police officer an "asshole" does not constitute fighting words); *People v. Gingello*, 67 Misc.2d 224, 324 N.Y.S.2d 122 (1971) (holding that the words "you are an asshole" directed to a police officer are not "fighting words"). There is no evidence that Buffkins' speech was an incitement to immediate lawless action. Neither arresting officer contended that Buffkins became violent or threatened violence. Moreover, both officers admitted that nobody outside the interview room heard Buffkins' comment. In addition, Buffkins' use of the word "asshole" could not reasonably have prompted a violent response from the arresting officers. In *Houston v. Hill*, 482 U.S. 451, 462, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1986), the Supreme Court recognized that the "fighting words" doctrine may be limited in the case of communications addressed to properly trained police officers because police officers are expected to exercise greater restraint in their response than the average citizen. The *Houston* Court stated:

> [T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers.... The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state.

*Id.* at 461–63, 107 S.Ct. at 2509–11.

### CONCLUSION

In summary, we affirm the district court's holding that the investigatory stop of Buffkins was not racially motivated. However, we hold the officers did not have a reasonable and articulable suspicion to effect a seizure of Buffkins as a matter of law. We find that Buffkins' arrest was made under both the "fighting language" and "unreasonable noise" subsections of the city ordinance. The City had notice of the unconstitutionality of the "unreason-

---

was covered by subsection (c), the unreasonable noise subsection of the disorderly conduct ordinance. Jt.App. at 243.

**16.** Because of our holding, we need not determine whether the district court erred by failing to instruct the jury as to the legal definition of "fighting words" or by failing to instruct the jury as to the personal liability of the officers for arresting Buffkins under subsection (c) of the Omaha disorderly conduct ordinance.

The district court also erred in submitting the legal question of qualified immunity to the jury. *See Fields v. City of Omaha*, 810 F.2d 830, 834 (8th Cir.1987). This is a question of law to be determined from all of the existing facts and circumstances based on whether reasonable officers knew or should have known that their conduct was violative of constitutional law. *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Here, as we have discussed, *no* evidentiary facts exist to allow a reasonable officer to believe the seizure and subsequent arrest of Buffkins were legal. We hold as a matter of law the officers possessed no evidentiary basis on which to assert a qualified immunity defense.

able noise" subsection and therefore the City was improperly dismissed. We also hold that Buffkins' speech directed at the officers did not constitute "fighting words." Accordingly, the judgment of the district court is affirmed as to the dismissal of plaintiff's claim under section 1981; we otherwise vacate the judgment in favor of the defendants and remand all of plaintiff's other claims, both state and federal, to the district court for a new trial.