**Wayne NICHOLS, Plaintiff,**

v.

**Jose CHACON, Arkansas State Police, in his Individual Capacity, Defendant.**

**No. 99–5180.**

United States District Court, W.D. Arkansas, Fayetteville Division.

Aug. 1, 2000.

---

N. Doug Norwood, Norwood & Norwood, P.A., Rogers, AR, for plaintiff.

Timothy G. Gauger, Asst. Attorney General, Sherri L. Robinson, Asst. Attorney General, Little Rock, AR, for defendant.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, District Judge.

This case is before the court on the parties' cross-motions for summary judgment.[1] The facts of this case are undisputed.

---

1. In responding to the cross-motion, defendant asks the court to apply Rule 56.1 of the Local Rules for the Eastern and Western Districts of Arkansas and deem admitted his statement of material facts not in dispute. Local Rule 56.1 requires a moving party to

Two legal questions are presented: First, were the plaintiff's constitutional rights violated when he was charged with disorderly conduct for having "flipped off" the defendant, a state trooper? Second, at the time this incident occurred, could the state trooper reasonably have believed plaintiff's action constituted disorderly conduct under the applicable state criminal statute?

## I. FACTS

On August 6, 1998, at approximately 10:29 a.m., the plaintiff, Wayne Nichols, was driving down a highway in Benton County, Arkansas. Nichols observed an Arkansas State Trooper driving a standard marked unit on the same highway in the opposite direction.

As Jose Chacon, a sixteen-year employee of the Arkansas State Police Highway Patrol Division, drove past, Nichols intentionally displayed his middle finger in an upward gesture, several times, to Chacon. There is no indication anyone other than Chacon witnessed the gestures.

This gesture is commonly referred to as "flipping someone off," "the bird," or "giving someone the finger." Chacon understood the gesture to mean "f___ you." *Chacon Deposition at 12.*

After observing this gesture, Chacon stopped his car, made a u-turn, turned on his blue lights, and went after Nichols. Chacon pulled Nichols over. Nichols apologized for the gestures explaining that he had mistaken Chacon for another Arkansas State Trooper, Joe Hutchens. Nichols intended to "flip off" Hutchens because Hutchens had removed Nichols' name from the list of wrecker services to be called in the case of traffic accidents.

Chacon, who was admittedly angered by the gestures, chose not to accept Nichols' apology. Chacon's reaction to the apology was to ask what made Nichols "think Joe Hutchens would let you get away with such a thing?" *Chacon Deposition* at 7. After Nichols apologized "over and over again," Chacon "gave him what he deserved, a citation" charging him with disorderly conduct under Ark.Code Ann. § 5–71–207(a)(3) (Repl.1997). *Chacon Deposition* at 13.

Under this subsection, a person commits the offense of "disorderly conduct if, with the purpose to cause public inconvenience, annoyance, or alarm or recklessly creating a risk thereof, he [i]n a public place uses abusive or obscene language, or makes an obscene gesture, in a manner likely to

annex to his motion a separate, short and concise statement of the material facts as to which he contends there is no genuine issue to be tried. The opposing party is to file his own statement of material facts as to which he contends a genuine issue exists to be tried. The rule further provides that all material facts shall be deemed admitted unless controverted by the statement filed by the non-moving party.

Because plaintiff did not file a statement of material facts in dispute, defendant asks us to deem his statement admitted. This local rule may be applied so long as it is applied in a manner consistent with the provisions of Rule 56 of the Federal Rules of Civil Procedure. *Silberstein v. Internal Revenue Service,* 16 F.3d 858, 860 (8th Cir.1994).

However, in this case plaintiff makes no argument that there are any genuine issues of fact. Instead, plaintiff merely contends the undisputed facts establish that he is entitled to summary judgment in his favor on the liabili-

ty aspects of this case. The "facts" contained in his statement that defendant asks the court to deem admitted are in reality legal conclusions.

Those on which the defendant relies are statements 4, 5, and 6. These statements of "fact" provide as follows: Statement 4. Ark. Code Ann. § 5–71–207 is a constitutional statute; Statement 5. Defendant reasonably believed that Plaintiff's action constituted disorderly conduct in violation of the Arkansas Code; and, Statement 6. No case law exists in the Arkansas Court of Appeals, the Arkansas Supreme Court, the Court of Appeals for the Eighth Circuit or the United States Supreme Court to indicate that the display of one's middle finger is protected speech. These three statements are not statements of fact but legal conclusions. A party cannot dictate the court's ruling on legal issues by attempting to disguise "legal conclusions" as "statements of undisputed material facts" and then ask the court to deem them admitted.

provoke a violent or disorderly response." Chacon believed Nichols was guilty of disorderly conduct because he had used an "obscene gesture" in a public place.

On December 1, 1998, Nichols appeared in the Bentonville Municipal Court on the disorderly conduct charge. After a ten or fifteen minute trial, Nichols was found not guilty of disorderly conduct because the gestures did not constitute "fighting words" under *Chaplinsky v. New Hampshire*, 315 U.S. 568, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

Nichols then filed this civil rights action under section 1983, 42 U.S.C. § 1983, contending his First, Fourth, and Fourteenth Amendment rights were violated when Chacon stopped him and issued him a ticket for engaging in an act that was constitutionally protected free speech. Chacon was sued in both his official and individual capacities. However, by memorandum opinion and order entered on December 13, 1999, the official capacity claim was dismissed on sovereign immunity grounds. Only the claim against Chacon in his individual capacity remains. Nichols seeks a declaratory judgment, compensatory and punitive damages, costs and attorney's fees.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Where the unresolved issues are primarily legal rather than factual, summary judgment is particularly appropriate. *See, e.g., Crain v. Board of Police Comm'rs*, 920 F.2d 1402, 1405–06 (8th Cir.1990).

## III. DISCUSSION

Chacon has moved for summary judgment on qualified immunity grounds. He contends there is no clearly established law in the governing jurisdictions indicating that Nichols' particular type of conduct, the displaying of one's middle finger in the manner described in this case, is protected speech. If such law exists outside the governing jurisdictions, the Arkansas courts, the Court of Appeals for the Eighth Circuit, and the United States Supreme Court, Chacon contends he cannot be expected to know about or follow those cases.

Even if Nichols' conduct is, in fact, protected speech under the First Amendment, Chacon contends a reasonable official is not expected to understand the subtleties of First Amendment law. As Nichols has not challenged the constitutionality of the Arkansas statute at issue, Chacon argues the statute must be presumed constitutional. Based on his knowledge of the disorderly conduct statute, Chacon argues he reasonably believed Nichols had violated the statute. He contends an ordinary person, if asked to describe an obscene gesture, would probably refer to the same gesture made by Nichols in this case. Notably missing from Chacon's analysis is any suggestion that Nichols' action caused any public inconvenience, annoyance, or alarm. In fact, Chacon was the only one to witness the gestures and be annoyed by it.

Nichols has also moved for summary judgment. He contends the undisputed facts establish that he engaged in protected First Amendment speech by displaying his middle finger to Chacon. Although he concedes this action was disrespectful, and undoubtedly ill advised, he contends Chacon's response to the gesture deprived him of his constitutional rights.

Chacon's

> assertion that he is protected by qualified immunity triggers a three-pronged inquiry: (1) whether the plaintiff[ ] ha[s]

asserted a violation of a constitutional or statutory right; (2) if so, whether that right was clearly established at the time of the violation; and (3) whether, given the facts most favorable to the plaintiff[ ], there are no genuine issues of material fact as to whether a reasonable official would have know that the alleged action violated that right.

*Burnham v. Ianni,* 119 F.3d 668, 673–74 (8th Cir.1997). *See Conn v. Gabbert,* 526 U.S. 286, 119 S.Ct. 1292, 1295, 143 L.Ed.2d 399 (1999) (In deciding an issue of qualified immunity, the court "must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether the right was clearly established at the time of the alleged violation.").

 Whether summary judgment on the grounds of qualified immunity is appropriate based on the facts described above is a question of law. *Pace v. City of Des Moines,* 201 F.3d 1050, 1055 (8th Cir. 2000) Chacon "bears the burden of proving that the plaintiff['s] First Amendment rights were not clearly established." *Burnham,* 119 F.3d at 674 (*citing Siegert v. Gilley,* 500 U.S. 226, 231, 111 S.Ct. 1789, 1792–93, 114 L.Ed.2d 277 (1991)). *See also Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir.1998).

While Chacon suggests there is little law in this area, he mistakenly attempts to narrow the relevant inquiry to the exact factual situation involved in this case and places too much reliance on the fact that plaintiff does not assert a direct challenge to the constitutionality of Ark.Code Ann. § 5–71–207(a)(3). Chacon also attempts to narrow review of decisional law to the Arkansas Courts, the Circuit Court for the Eighth Circuit, and the United States Supreme Court.

 Our inquiry is not so confined. *Buckley v. Rogerson,* 133 F.3d 1125, 1129 (8th Cir.1998) ("In order to determine whether a right is clearly established, it is not necessary that the Supreme Court has

directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law, including decisions of state courts, other circuits, and district courts.") (citations omitted). Under the facts of this case, even if our inquiry was narrowly confined in the manner suggested by Chacon, he would still not be entitled to summary judgment in his favor. This is true because Chacon ignores a large body of law, having its genesis in decisions of the United States Supreme Court, addressing whether an allegedly obscene gesture or the use of profane language is constitutionally protected speech not subject to punishment as a criminal act. This is far from the first case in which a private citizen has either by words or gesture communicated an offensive message to a law enforcement officer. Nor is much of this body of law of recent vintage.

Retaliation based on the exercise of First Amendment rights has long been recognized as a basis for liability under § 1983. Albeit in a different context, the Eighth Circuit has remarked that "[n]o right is more clearly established in our republic than freedom of speech." *Casey v. City of Cabool,* 12 F.3d 799, 804 (8th Cir.1993) (§ 1983 First Amendment retaliatory discharge case).

 In general, expressive conduct is protected from government regulation under the First and Fourteenth Amendments. As has oft been said, "even crudity of expression may be constitutionally protected." *State v. Drake,* 325 A.2d 52, 54 (Me.1974) (*citing Hess v. Indiana,* 414 U.S. 105, 94 S.Ct. 326, 38 L.Ed.2d 303 (1973)).

Gesturing in the manner described in this case has a commonly understood meaning and connotation. The impact of the gesture was as effective as spoken words in getting Nichols' message across. Without a doubt, the gesture was communicative conduct and is analyzed just as if

Nichols .had spoken the words "f___ you." *Burnham v. Ianni*, 119 F.3d 668, 674 (8th Cir.1997) ("Nonverbal conduct constitutes speech if it is intended to convey a particularized message and the likelihood is great that the message will be understood by those who view it, regardless of whether it is actually understood in a particular instance in such a way.") (citation omitted).

■■■ "Speech is often provocative and challenging ... [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest." *Terminiello v. City of Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 895, 93 L.Ed. 1131 (1949). Pure speech is protected unless the words, by their utterance alone, inflict injury or tend to evoke immediate violence or other breach of the peace. *Gooding v. Wilson*, 405 U.S. 518, 525, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972). Such "fighting words" are not protected. *City of Houston v. Hill*, 482 U.S. 451, 107 S.Ct. 2502, 2511 n. 12, 96 L.Ed.2d 398 (1987).

The Supreme Court has held on numerous occasions that the "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill*, 107 S.Ct. at 2509. It has said that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Hill*, 107 S.Ct. at 2510.

In *Lewis v. City of New Orleans*, 415 U.S. 130, · 94 S.Ct. 970, 39 L.Ed.2d 214 (1974), the Supreme Court found unconstitutional a municipal ordinance that made it a crime "for any person wantonly to curse or revile or to use obscene or opprobrious language toward or with reference to any member of the city police while in the actual performance of his duty." Lewis had been convicted of violating this ordinance because she yelled obscenities and threats at an officer, after he stopped the vehicle in which she was a passenger, while he was asking her husband for his driver's license.

In his concurring opinion, Justice Powell suggested that "even the 'fighting words' exception recognized in *Chaplinsky* ... might require a narrower application in cases involving words addressed to a police officer, because 'a properly trained officer may reasonably be expected to exercise a higher degree of restraint' than the average citizen, and thus be less likely to respond belligerently to 'fighting words.'" *Hill*, 107 S.Ct. at 2510 (*quoting Lewis*, 94 S.Ct. at 973).

In *Cohen v. California*, 403 U.S. 15, 26, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971), the Supreme Court held that "absent a more particularized and compelling reason for its actions, [a] State may not, consistently with the First and Fourteenth Amendments, make the simple public display ... of [a] four-letter expletive a criminal offense." In that case, an individual, while in a public building, had the words "f___k you" displayed on his clothing.

The Court noted that:

while the particular four-letter word being litigated here is perhaps more distasteful than most others of its genre, it is nevertheless often true that one man's vulgarity is another's lyric. Indeed, we think it is largely because governmental officials cannot make principled distinctions in this area that the Constitution leaves matters of taste and style so largely to the individual.

*Cohen*, 403 U.S. at 25, 91 S.Ct. 1780.

Statutes proscribing the use of abusive or obscene language or the making of obscene gestures in public places have repeatedly been struck down as unconstitutionally overbroad because they prohibit a substantial amount of constitutionally protected expression. For instance *Hill, supra*, the Supreme Court invalidated a county ordinance which made verbally challenging an officer in the line of duty unlawful. *See e.g., People v. Ananias*, 152

Misc.2d 660, 578 N.Y.S.2d 371 (1991) (disorderly conduct statute unconstitutionally overbroad); *State v. Spencer*, 289 Or. 225, 611 P.2d 1147 (1980) (disorderly conduct statute unconstitutional).

Similarly, arrests have been held to be without probable cause when based on obscene gestures and/or verbal challenges to the police. For instance, in *Duran v. City of Douglas*, 904 F.2d 1372, 1378 (9th Cir. 1990), Ralph Duran directed a series of expletives and an "obscene" hand gesture at a police officer, Gilbert Aguilar. *Duran*, 904 F.2d at 1374. Earlier in the evening the two had come into contact when Aguilar responded to a bartender's complaint about an unruly customer, Duran. *Id.* Aguilar and Duran exchanged "heated words" and Aguilar then escorted Duran out. *Id.*

Duran left in an automobile driven by his wife, Alice. *Id.* "Soon thereafter, while out on patrol, Aguilar observed a car with a passenger who was directing an obscene gesture toward him through an open window." *Id.* Because of the darkly-tinted windows, Aguilar did not know the passenger's identity. *Id.*

After observing the gesture, Aguilar started following the car. As Aguilar followed the car, Duran began "yelling profanities in Spanish and continued to make obscene gestures." *Id.* Aguilar made a traffic stop to find out why Duran had yelled profanities and made an "obscene" gesture toward him. *Id.* at 1374–75.

The Durans filed a section 1983 suit seeking damages for the allegedly unlawful stop and arrest. They then filed a motion for partial summary judgment on the issue of liability. Aguilar filed a motion for summary judgment on qualified immunity grounds. The district court ruled in favor of the Durans.

On appeal, the Ninth Circuit first noted that since the relevant facts were undisputed "resolution of the qualified immunity question will also decide the question of Aguilar's liability." *Id.* at 1375.

It noted that there are "well-defined limits on what police officers may do in discharging their duties, and police may be held liable for acting outside those limits." *Id.* at 1376. Fundamentally, the Ninth Circuit noted, the police may not "interfere with the freedom of private persons unless it be for specific, legitimate reasons." *Id.* (citation omitted).

It found "[m]issing from the record ... any legitimate, articulate reason for Aguilar to have detained Duran." It noted there was no evidence of danger to the public, no warrant, and no evidence Duran was in possession of a controlled substance or had been or was about to engage in criminal activity. *Id.* at 1377.

The Ninth Circuit then turned to a discussion of Aguilar's attempt to rely on Duran's use of profanity and his displaying an "obscene" gesture as grounds for the stop and detention. It said:

Defendant relies heavily on the fact that Duran was making obscene gestures toward him and yelling profanities in Spanish while traveling along a rural Arizona highway. We cannot, of course, condone Duran's conduct; it was boorish, crass and, initially at least, unjustified. Our hard-working law enforcement officers surely deserve better treatment from members of the public. But disgraceful as Duran's behavior may have been, it was not illegal; criticism of the police is not a crime. *Houston v. Hill*, 482 U.S. 451, 461–63, 107 S.Ct. 2502, 2509–10, 96 L.Ed.2d 398 (1987).

Aguilar further contends that, even if Duran's verbal conduct was otherwise protected, he believed that it constituted disorderly conduct or a disturbing of the peace. However, because the car was traveling late at night on a deserted road on the outskirts of town, Duran's conduct could not have disturbed the peace or incited a riot; Aguilar has presented no evidence showing that it could have. Nor could Duran's conduct suggest that he had committed or was about

to commit any other illegal act. Indeed, one would expect someone engaged in shady business to act in a more stealthy fashion than did the plaintiff here. In sum, we don't see how Duran's boisterous conduct—tasteless though it may have been—gave Aguilar any cause to detain him. Absent such cause, the stop and detention was illegal and may be the subject of liability.

*Id.* at 1377.

In a footnote, the Ninth Circuit noted that:

The First Amendment does not prevent enforcement of disorderly conduct statutes so long as they are not vague or applied to curb protected speech. *See Hill,* 482 U.S. at 465–67, 107 S.Ct. at 2511–13; *Colten v. Kentucky,* 407 U.S. 104, 111, 92 S.Ct. 1953, 1957–58, 32 L.Ed.2d 584 (1972). Here, because the only person Duran could have possibly disturbed was Aguilar, his speech was protected and the statute could not apply. *See Hill,* 482 U.S. at 461–63, 107 S.Ct. at 2509–10.

The Ninth Circuit then continued its analysis by stating that:

Duran's conduct is not totally irrelevant, however, as it suggests a possible motive for his detention, one upon which law enforcement officers may not legitimately rely. The Durans contend, and the district court held, that Aguilar stopped their car at least partly in retaliation for the insult he received from Duran. If true, this would constitute a serious First Amendment violation. "[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *Hill,* 482 U.S. at 461, 107 S.Ct. at 2509. The freedom of individuals to oppose or challenge police action verbally without thereby risking arrest is one important characteristic by which we distinguish ourselves from a police state. *Id.* at 462–63, 107 S.Ct. at 2510. Thus, while police, no less than anyone else, may resent having obscene words and ges-

tures directed at them, they may not exercise the awesome power at their disposal to punish individuals for conduct that is not merely lawful, but protected by the First Amendment.

Inarticulate and crude as Duran's conduct may have been, it represented an expression of disapproval toward a police officer with whom he had just had a run-in. As such, it fell squarely within the protective umbrella of the First Amendment and any action to punish or deter such speech—such as stopping or hassling the speaker—is categorically prohibited by the Constitution. Aguilar admits that he stopped Duran because he made an obscene gesture and yelled profanities toward him. Aguilar Depo. at 85–86. Because Aguilar might have detained Duran in retaliation for engaging in this protected speech and conduct, summary judgment in favor of Aguilar would have been inappropriate. At the same time, because Aguilar claims that he had no retaliatory motive—that he honestly believed Duran's actions indicated that criminal activity might be afoot—the district court's grant of summary judgment in favor of Duran on this issue was also error. There remains a material issue of fact, therefore, whether Aguilar intended to hassle Duran as punishment for exercising his First Amendment rights. To the extent the trier of fact determines that officer Aguilar stopped Duran in retaliation for Duran's method of expressing his opinion, this would constitute a separate constitutional violation that could form the basis of liability under section 1983.

*Id.* at 1377–78.

With respect to whether the rights in question were so clearly established "that officer Aguilar should have known he was acting illegally when he initiated the traffic stop," the Ninth Circuit held they were. *Id.* at 1378. It stated:

If there is one irreducible minimum in our Fourth Amendment jurisprudence,

it is that a police officer may not detain an individual simply on the basis of suspicion in the air. No matter how peculiar, abrasive, unruly or distasteful a person's conduct may be, it cannot justify a police stop unless it suggests that some specific crime has been, or is about to be, committed, or that there is an imminent danger to persons or property. Were the law any different—were police free to detain and question people based only on their hunch that something may be amiss—we would hardly have a need for the hundreds of founded suspicion cases the federal courts decide every year, for we would be living in a police state where law enforcement officers, not the courts, would determine who gets stopped and when.

No less well established is the principle that government officials in general, and police officers in particular, may not exercise their authority for personal motives, particularly in response to real or perceived slights to their dignity. Surely anyone who takes an oath of office knows—or should know—that much. *See Hill,* 482 U.S. at 462, 107 S.Ct. at 2510. Whether or not officer Aguilar was aware of the fine points of First Amendment law, to the extent he is found to have detained Duran as punishment for the latter's insults, we hold that he ought to have known that he was exercising his authority in violation of well-established constitutional rights.

*Id.* at 1378

In *Brockway v. Shepherd,* 942 F.Supp. 1012 (M.D.Pa.1996), the court held that the display of the extended middle finger in a show of disrespect was not an obscene gesture within the meaning of relevant Supreme Court opinions and does not amount to fighting words. The court ruled the display was therefore protected by the First Amendment.

However, the court went on to hold the officer entitled to qualified immunity because the passenger's right not to be arrested for making the gesture was not

clearly established at the time of the arrest, January 14, 1996. In so holding, the court issued the following caution:

> It is important, however, at some point to establish firmly the right in question. We therefore emphasize: The use of profane or vulgar language is protected by the First Amendment unless some exception to the general protection applies. That is, standing alone, profane or vulgar language is not itself obscene and does not amount to fighting words. The same principle applies to the use of a gesture which represents profane or vulgar language, and the communication must be looked at in its entirety and in context to determine whether an exception to the general protection of speech applies.

*Id.* at 1017.

In *Mackinney,* the Ninth Circuit held that the police officer should have known that verbal protests could not support an arrest under a California statute and that it was "unreasonable [for the officer] to think otherwise." *Mackinney v. Nielsen,* 69 F.3d 1002, 1007 (9th Cir.1995). As the Ninth Circuit has remarked, "[t]hese cases establish a First Amendment right to challenge the police. Even when crass and inarticulate, verbal challenges to the police are protected." *Mackinney,* 69 F.3d at 1007. In short, " 'criticism of the police is not a crime.' " *Mackinney,* 69 F.3d at 1007 (*quoting Duran,* 904 F.2d at 1377).

In concluding, the Ninth Circuit noted that:

> Police officers have a difficult job, and they deserve the respect of their community. But they in turn must respect the right of individuals in that community to question their government and the role of the police. A reasonable officer should have known that Mackinney simply was exercising that right.

*Mackinney,* 69 F.3d at 1007.

In *Sandul v. Larion,* 119 F.3d 1250 (6th Cir.1997), the Sixth Circuit dealt with a similar incident stemming from an August

3, 1990, arrest. There Officer Larion was talking with a group of abortion protestors when the passenger of a truck, John Sandul, "leaned out of the vehicle as it passed by the abortion protestors and shouted 'f__k you,' and extended his middle finger to the group." *Id.* at 1252. The truck in which Sandul was a passenger was separated from the protestors by a lane of traffic, a grassy median strip, and a sidewalk. *Id.*

"Believing that Sandul's conduct violated the city of Livonia's disorderly conduct ordinance, Larion began pursuing the truck until it stopped in front of Sandul's house." *Id.* After an exchange at Sandul's house that required backup assistance, Sandul was arrested and charged with disorderly conduct and felonious assault. *Id.* Sandul was acquitted of the disorderly conduct charge and a mistrial was declared on the assault charge. *Id.* at 1253.

Sandul filed a § 1983 action. He did not challenge the constitutionality of the Livonia ordinance but rather argued that "Larion violated his constitutional rights by falsely arresting Sandul while he was exercising his right to free speech and that because Officer Larion should have known that he was violating Sandul's First Amendment rights he is not entitled to qualified immunity." *Id.* at 1254.

The Sixth Circuit first determined that Sandul's actions were protected speech. *Id.* The court noted that under *Cohen,* "the use of the 'f-word' in and of itself is not criminal conduct." *Id.* at 1255. It concluded:

> Sandul's words and actions do not rise to the level of fighting words. The actions were not likely to inflict injury or to incite an immediate breach of the peace. Sandul's vehicle was traveling at a high rate of speed on the opposite side of the street, a considerable distance away from the protestors to whom the language was directed. Sandul was in a moving vehicle; the entire incident was over in a matter of seconds.

*Id.* at 1255. It appeared that no one other than Larion even acknowledged Sandul's behavior, given these facts and the absence of face-to-face contact, the Sixth Circuit stated "it is inconceivable that Sandul's fleeting actions and words would provoke the type of lawless action alluded to in *Chaplinsky.* Sandul's action was not fighting words and therefore was speech protected by the First Amendment." *Id.*

The court then concluded that "[i]n 1990 when Sandul was arrested for his use of the 'f-word,' it was clearly establish that speech is entitled to First Amendment protection with the exception of fighting words." *Id.* It noted that "*Chaplinsky* had been decided over fifty years earlier and the *Cohen* decision, which prohibited criminal prosecution for the use of the same expletive, had been decided in 1971." Given these facts, the Sixth Circuit stated:

> It was clearly established at the time of Sandul's arrest that his actions were within the contours of his First Amendment rights.
>
> Applying the objective reasonableness standard, a reasonable officer should have known that the words and gestures employed by Sandul amounted to protected speech. Well-established Supreme Court precedents demonstrate Sandul's constitutional right to free speech, with the exception of fighting words. *See, e.g., Cohen, supra* (holding that absent a compelling and particularized reason, the First and Fourteenth Amendments preclude States from prohibiting the public display of a four-letter expletive); and *Chaplinsky, supra* (holding that the only types of speech denied First Amendment protection are words which by their very utterance inflict injury or incite an immediate breach of the peace). These cases should leave little doubt in the mind of a reasonable officer that the mere words and gesture "f__k you" are constitutionally protected speech. " '[S]tate employees may not rely on their ignorance of even the most esoteric aspects of the law to deny indi-

viduals their [constitutional] rights.'" *Long*, 929 F.2d at 1115 (*quoting Wentz v. Klecker*, 721 F.2d 244 (8th Cir.1983)). As a reasonable officer, Larion should have known that the words and gestures used by Sandul were constitutionally protected, and that under the First Amendment, the disorderly conduct ordinance could only apply to "fighting words."

*Id.* at 1255–56.

The Sixth Circuit next rejected, Larion's argument that "he had probable cause to arrest Sandul because he reasonably believed that Sandul had violated the Livonia disorderly conduct statute." *Id.* at 1256. While an officer "is permitted to make an arrest if there is probable cause to believe that the arrestee has committed or is committing an offense," the court concluded "Larion did not have probable cause to believe that Sandul had violated any of the three Livonia ordinances at issue." *Id.* As Sandul's "actions did not constitute fighting words and thus amounted to protected speech," the court conclude there was no probable cause for the arrest since "[s]uch protected speech cannot serve as the basis for a violation of any of the Livonia ordinances at issue." *Id.*

Finally, the Sixth Circuit rejected Larion's argument that "Sandul has no cognizable First Amendment claim because he did not challenge the constitutionality of the statute under which he was arrested." *Id.* The court held:

> Sandul's failure to challenge the relevant Livonia ordinances does not obliterate his inalienable First Amendment rights. Sandul's First Amendment rights are guaranteed, absolute, and protected unless his speech falls within an exception; such is not the case here. While the Livonia ordinances are presumptively valid as they have not been challenged, Sandul's § 1983 claims are unaffected by his failure to challenge the constitutionality of the ordinances.

*Id.* at 1256.

The case of *Cook v. Bd. of County Commissioners of the County of Wyandotte*, 966 F.Supp. 1049 (D.Kan.1997) also involved a § 1983 claim by an individual who was arrested for disorderly conduct after "flipping the bird" to a highway patrol officer. The court rejected the argument that the gesture was the equivalent of "fighting words."

In rejecting the officer's claim of qualified immunity, the court stressed that the real issue was "not whether plaintiff had a constitutional right to 'flip off' Officer Drake, but whether Officer Drake reasonably could have believed that plaintiff was engaged in disorderly conduct ... when he 'flipped [him] the bird.'" *Id.* at 1052. It held that since 1980, the Kansas courts had narrowly limited the disorderly conduct statute to "fighting words," or words "which *by their very utterance* inflict injury or tend to incite an immediate breach of the peace." *Id.* On the record before it, the court held it could not:

> infer that a reasonable police officer would necessarily believe that plaintiff was engaged in disorderly conduct or that—in light of clearly established law and the information known to Officer Drake—a reasonable officer would have had probable cause to arrest plaintiff and charge him with disorderly conduct in violation of Kansas Law.

*Id.*

In *Buffkins v. City of Omaha*, 922 F.2d 465 (8th Cir.1990), the Eighth Circuit concluded that an individual's reference to the arresting officers as "asshole" was not within the category of "fighting words" excluded from protection of the First Amendment. It agreed that the district court should have found as "a matter of law that the arresting officers could not have reasonably concluded that they had probable cause to arrest her for using a 'fighting word.'" *Id.* at 472.

It stated there was "no evidence Buffkins' speech was an incitement to immediate lawless action." *Id.* Moreover, it noted that no one outside the interview room

heard the comment. *Id.* Additionally, it stated:

> Buffkins' use of the word "asshole" could not reasonably have prompted a violent response from the arresting officers. In *Houston v. Hill,* 482 U.S. 451, 462, 107 S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1987), the Supreme Court recognized that the "fighting words" doctrine may be limited in the case of communications addressed to properly trained police officers because police officers are expected to exercise greater restraint in their response than the average citizen.

*Id.*

During his deposition, although he did not know of the *Buffkins* case by name, Chacon acknowledged having heard about the case. Chacon was not asked whether he understood the holding of that case.

While Chacon asserts there is no relevant authority in the governing jurisdictions, he fails to explain how the cases discussed above, including the Supreme Court decisions in *Cohen* and *Hill,* can be distinguished. He also fails to note that the Arkansas Supreme Court has itself limited application of the disorderly conduct statute to "fighting words."

Although the Arkansas statute at issue here, Ark.Code Ann. § 5–71–207(a)(3) was found to be constitutional by the Arkansas Supreme Court, the court's ruling was premised on a limiting construction of the statute. *Bailey v. State,* 334 Ark. 43, 972 S.W.2d 239 (1998). The court read the language of subsection (a)(3) as incorporating the "fighting words" rule of *Chaplinsky.* *See also* Dawn C. Egan, *"Fighting Words" Doctrine: Are Police Officers Held to a Higher Standard, or per Bailey v. State, Do We Expect No More from Our Law Enforcement Officers than We Do from the Average Arkansan?,* 52 Ark. L.Rev. 591 (1999).

 While we agree the gesture utilized by Nichols was crude, insensitive, offensive, and disturbing to Chacon's sensibilities, it was not obscene under the relevant Supreme Court precedent, did not constitute "fighting words," and was protected as "free speech" under the First Amendment to the United States Constitution. We also believe that this right was clearly established on August 6th of 1998 when Chacon arrested Nichols. Accordingly, we hold as a matter of law that Chacon is not entitled to qualified immunity and that his arrest of Nichols violated Nichols' First and Fourth Amendment rights.

## IV. CONCLUSION

For the reasons stated, defendant's motion for summary judgment will be denied and plaintiff's motion for summary judgment on liability will be granted. This leaves for trial the issue of damages. A separate order in accordance herewith will be concurrently entered.