COURT OF APPEALS OF VIRGINIA

Present: Judges Ortiz, Friedman and White
Argued at Christiansburg, Virginia

HERMAN TRACY EVANS

v.      Record No. 0809-23-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE KIMBERLEY SLAYTON WHITE
AUGUST 6, 2024

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
J. Fredrick Watson, Judge

Kelsey Bulger, Senior Appellate Attorney (Virginia Indigent Defense
Commission, on briefs), for appellant.

Lauren C. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Herman Tracy Evans appeals his convictions, following a bench trial, for resisting arrest,

disorderly conduct, and animal cruelty, in violation of Code §§ 18.2-460, 18.2-415, and 3.2-6570.[1]

On appeal, he argues that trial court erred when it denied his motion to strike and found the

evidence sufficient to support his convictions.  We agree and reverse the convictions.

BACKGROUND

On appeal, "we review the evidence in the 'light most favorable' to the Commonwealth."

*Clanton v. Commonwealth*, 53 Va. App. 561, 564 (2009) (en banc) (quoting *Commonwealth v.*

*Hudson*, 265 Va. 505, 514 (2003)).  That principle requires us to "discard the evidence of the

accused in conflict with that of the Commonwealth, and regard as true all the credible evidence

favorable to the Commonwealth and all fair inferences that may be drawn therefrom."  *Kelly v.*

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

[1] The trial court acquitted Evans of killing or maliciously injuring a police animal.

*Commonwealth*, 41 Va. App. 250, 254 (2003) (en banc) (quoting *Watkins v. Commonwealth*, 26 Va. App. 335, 348 (1998)).

During daylight hours on April 3, 2022, Lynchburg Police Officers S.C. Reed and Williams responded to a "disorderly call."[2] Both officers wore their police uniforms and displayed their badges of authority. Officer Reed arrived first with his police dog, Knox. Knox was trained to bite and hold a suspect even if a suspect resisted. Knox wore a bullet proof vest with "police" on one side and "K-9" on the other.

Footage from Officer Reed's body worn camera showed him arriving at a residence, exiting his patrol vehicle, and approaching a home while leaving Knox in the police vehicle.[3] There was no one outside when Officer Reed arrived. As the officer walked across the lawn, Evans slammed his front door shut. From the lawn, Officer Reed announced that he was a police officer. Evans opened the door, stepped onto the front porch and appeared "very amped up, very angry, and very aggressive." Officer Reed inquired, "you ok?" Evans stated, "ya, I'm fine. How you doing?" Officer Reed stated, "Good. What's going on?" As Evans re-entered his home he yelled, "ain't no fucking thing going on, get the fuck out of here." Evans also repeatedly slammed his door and banged loudly on his windows while the officers were outside his residence.

Officer Reed acknowledged Evans's request to leave and told Evans not to come outside because he did not want to arrest Evans. Nonetheless, Evans reappeared and asked what Officer Reed had said. Officer Reed repeated his warning and explained that the police department had received calls complaining about Evans's behavior outside of his home. Evans replied, "I'm not

---

[2] Officer Williams's first name was never disclosed at trial.

[3] A portion of Officer Williams's body camera footage, that depicted the officers' entry into Evans's residence, was also entered into evidence.

inside [sic] motherfucker, leave."[4]  Officer Reed acknowledged Evans's second request to depart and began to walk back to his vehicle.

As Officer Reed turned to leave, Evans opened the door again, and from the door jamb stated, "You get your fucking piece of shit ass out of here, alright."  Officer Evans responded, "Sir you need to go inside."  Evans continued, "you can leave.  Get the fuck back in the car LPD and leave, alright."  Officer Reed again acknowledged Evans's request but ordered him to "stay inside."

As Officer Reed walked back to his patrol vehicle, Evans continued to yell at him from inside of the residence.  Officer Reed ordered Evans to remain in his home or he would be arrested for disorderly conduct.  Evans continued to shout profanities that could be heard outside his residence.

At this juncture, Officer Reed determined that he would arrest Evans for disorderly conduct.  Officer Reed noted that, based on his training and experience, he believed that Evans was under the influence of narcotics.  Consequently, Officer Reed retrieved Knox from his patrol vehicle.  Officer Reed noted that Knox was to be a deterrent to any aggression and was to be a way to protect both himself and Officer Williams, who arrived at the scene as he was retrieving the dog.  While Officer Reed was in the road next to his police car, he warned Evans that he would "g[o] to jail for disorderly conduct" if he exited the residence again.  Nevertheless, Evans continued to slam the door and scream profanities.  The officer could hear Evans yelling at him from inside the residence.

When Officer Reed returned to the residence with Knox on a leash and Officer Williams with him both the storm door and front door were closed.  Officer Reed told Officer Williams that he was going to arrest Evans for disorderly conduct and that Evans had "already been outside, so we've got him."  Evans, from inside of the residence continued to yell profanities at the officers.  Evans briefly opened the doors but then secured the storm door before Officer Reed informed him

---

[4] Evans was standing on the door jamb when he said this.

that he was under arrest and gestured for Evans to step out of the residence. Evans began to slam the front door. Officer Reed then opened the storm door and kicked the front door open before it latched, and Knox went inside. As Knox entered the home, Evans attempted to slam the door shut again and the door's handle struck Knox's head and body.

Once Knox was in the home and Officer Reed was positioned in the door frame, the officer commanded the dog to apprehend Evans as the officer could no longer see Evans. Knox bit Evans's upper left leg. Evans repeatedly punched Knox in the head with a closed fist and then used both of his hands to pry Knox's jaws apart.[5] Once the dog released his leg, Evans put one hand over Knox's nose causing Knox to gag. Officer Reed testified that the noise on the video was Knox gagging, or "back breathing," because he was being suffocated. Officer Reed then struck Evans thrice rendering Evans unconscious; Knox bit Evans's bicep and took him to the floor. Officer Reed stated that he struck Evans because Knox was struggling to breathe, and Evans was continuing to hit the dog. Evans was then handcuffed while face-down on the ground, unconscious.

At no time during the entire encounter was anyone observed outside of the residence except for the officers and Evans. Evans was either on his front porch, at his front door jamb, or inside his residence during any interactions with the officers. The residence is surrounded by other houses and is situated at the corner of two public streets.

After the incident, Officer Reed observed a small laceration that appeared to be new below Knox's bottom left canine tooth. Knox had no observable injuries before the incident, but Officer Reed admitted he had not evaluated Knox before the shift began. Evans himself received injuries that were enough to require hospital admission.

---

[5] Officer Reed testified that he observed Evans punch Knox three to four times in the head with a closed fist. Officer Reed commanded Evans not to harm the dog.

On April 11, 2023, a bench trial was held, and the Commonwealth presented testimony consisting of the evidence above. After the Commonwealth's evidence was presented, Evans moved to strike all the charges based on a lack of sufficient evidence. The motion to strike was denied, and the defense rested without presenting any evidence.

At the close of all the evidence, the trial court made certain factual findings before rendering its verdict. The trial court found that Officer Reed was credible and that the body worn camera footage spoke for itself. The trial court determined that Evans repeatedly came outside[6] and "the things that [Evans was] saying to Officer Reed were the types of things that would have a direct tendency to cause acts of violence." When Officer Reed told Evans he was under arrest, Evans retreated into the house and slammed the door. As Knox apprehended Evans, Evans punched Knox two or three times and resisted the officer's attempts to arrest him. The trial court convicted Evans of resisting arrest, disorderly conduct, and animal cruelty, and sentenced him to 14 months of active incarceration. Evans appeals.

ANALYSIS

Evans contends that the trial court erred in denying his motion to strike the charges. In challenging the trial court's denial of his motion to strike the charges, Evans necessarily asserts that the evidence was insufficient as a matter of law. "What the elements of the offense are is a question of law that we review *de novo*." *Linnon v. Commonwealth*, 287 Va. 92, 98 (2014). "Whether the evidence adduced is sufficient to prove each of those elements is a factual finding, which will not be set aside on appeal unless it is plainly wrong." *Id.* "In reviewing that factual finding, we consider the evidence in the light most favorable to the Commonwealth and give it the benefit of all reasonable inferences fairly deducible therefrom." *Id.* "After so viewing the evidence, the question

---

[6] Video footage introduced into evidence showed Evans on his front porch and at the door jamb of his open front door and open storm door.

is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "In sum, if there is evidence to support the conviction, the reviewing court is not permitted to substitute its judgment, even if its view of the evidence might differ from the conclusions reached by the finder of fact at the trial." *Id.*

## I. Disorderly Conduct

Evans argues that the evidence was insufficient to support a disorderly conduct conviction. He asserts that he did not physically threaten the officer or cause a commotion that called neighbors to the area. He contends that he only used rude language that may have offended the officer and his actions did not rise to the level of inciting violence. He asserts that rude language alone could not justify the officer's aggressive response.

To prove Evans's guilt of disorderly conduct, the Commonwealth was required to prove that he, while in a public place,[7] "with the intent to cause public inconvenience, annoyance, or alarm, or recklessly creating a risk thereof, . . . engage[d] in conduct having a direct tendency to cause acts of violence by the person or persons at whom, individually, such conduct [wa]s directed." Code § 18.2-415(A)(1).

The requirement that Evans's actions or behavior must have "a direct tendency to cause acts of violence" is dictated by concern for First Amendment free speech protections:

> [T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers. "Speech is often provocative and challenging. . . . [But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance, or unrest."

*City of Houston v. Hill*, 482 U.S. 451, 461 (1987) (all but first alteration in original) (quoting *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949)). The "question as to whether a particular act is

---

[7] Evans does not challenge whether he was in a public place; therefore, we do not address this element of the statute.

- 6 -

disorderly conduct depends largely on the facts in the particular case," and we consider "not only the nature of the particular act . . . but also the time and place of its occurrence as well as all the surrounding circumstances." *Keyes v. City of Virginia Beach*, 16 Va. App. 198, 200 (1993) (quoting *Collins v. City of Norfolk*, 186 Va. 1, 5 (1947)).

In *Keyes*, the encounter with law enforcement began just before 11:00 p.m. during a traffic stop. Keyes, who was pleading with the officer not to issue her a summons, jumped out of the police vehicle, refused to return, and began screaming at the officer. She balled up her fists and told the officer that "you ain't going to do nothing to me." *Id.* at 199. The officer testified that her actions made him believe that he would have to fight Keyes in order to subdue her. Another officer could hear her screaming from several blocks away. He heard Keyes exclaiming that the officers were "breaking her bones" and "brutalizing her." *Id.* at 200. This Court held that "[b]ecause [the officer] reasonably 'felt as though [he] was going to have to fight' to subdue [Keyes], her behavior had 'a direct tendency to cause acts of violence by the person . . . at whom [it was] directed.'" *Id.* (third, fifth, and sixth alterations in original) (quoting *Burgess v. City of Virginia Beach*, 9 Va. App. 163, 167-68 (1989)).

Evans cites *Ford v. City of Newport News*, 23 Va. App. 137 (1996), as a case comparable to his. In that case, two officers observed Ford around 9:00 p.m. pushing a bicycle "which could [have been] stolen, at night in a known high crime area." *Id.* at 141. When the officers tried to engage Ford, he became "loud, angry, and uncooperative." *Id.* Ford stated, "I'm tired of this shit. The cops in Hampton do the same shit, and I'm not going to put up with it anymore." *Id.* Ford was so loud and boisterous while using offensive language that nearby apartment dwellers came out to assist the officers. *Id.* Additionally, Ford made physical gestures such as throwing his hands up in the air while being confronted by the police. *Id.* This Court held that the police "did not have reason to believe that the defendant's conduct would provoke a violent response from the person or persons at

whom such conduct was directed." *Id.* at 144. Ford made no direct threats to the officers and made no statements that would reasonably incite a breach of peace. *Id.* In short, Ford's conduct would not "cause a reasonable officer to respond with physical force or violence." *Id.*

This Court has adopted the position that "the fighting words doctrine may be limited in the case of communications addressed to properly trained police officers because police officers are expected to exercise greater restraint in their response than the average citizen." *Marttila v. City of Lynchburg*, 33 Va. App. 592, 600 (2000) (quoting *Bufkins v. City of Omaha*, 922 F.2d 465, 472 (8th Cir. 1990)). In *Marttila*, officers were attempting to place Marttila in "investigative detention" when Marttila began cussing the officers, calling them "fucking pigs," saying that they were "fucking jokes," and that they "should be at a fucking donut shop." *Id.* at 595. This Court said that the words and insults "did not have the necessary direct tendency to cause an immediate, forceful, and violent reaction by a reasonable person in the position of the police officers at whom the words were directed." *Id.* at 602. Further, this Court stated "[t]his is precisely the type of 'verbal criticism [of] . . . police officers' that is 'protected against censorship or punishment' by the First Amendment . . . ." *Id.* at 603 (second and third alterations in original).

Here, like in *Ford* and in *Marttila*, Evans made no threatening remarks or movements to the police officers. Evans told police that he was "fine" when they arrived on the scene. He then stated "ain't no fucking thing going on, get the fuck out of here." Evans continued, "you can leave. Get the fuck back in the car LPD and leave, alright." Not only did he not verbally or physically threaten the officers, but all remarks were made while he was either standing on his front porch, from his door jamb, or from inside the residence and did not incite any bystanders or neighbors. While Evans's remarks are surely rude and unseemly, telling the officers to leave and to get off his property, even when laced with profanity, were not actions established by the facts in this case that

would have a "direct tendency" to cause a violent reaction from a reasonably trained police officer. In fact, the record contains no testimony that either officer felt threatened by the remarks.[8]

The record in this case contained no evidence that Evans's actions and words had the necessary tendency to incite a breach of the peace or cause a violent action from a reasonably trained police officer. For that reason, the evidence was insufficient to establish a violation of Code § 18.2-415 and we reverse the trial court.

## II. Resisting Arrest

Challenging his conviction for resisting arrest, Evans argues that the evidence proved that he never fled nor moved away from the officers. He contends that he simply closed his front door and remained at the threshold. He claims when Knox attacked, he remained standing in the same spot he had been when the officer said he was under arrest. This, he argues, was not sufficient flight for resisting arrest.[9]

Code § 18.2-460(E)[10] makes it a Class 1 misdemeanor to knowingly flee from a law-enforcement officer attempting to make a lawful arrest, but only if the officer "applies physical

---

[8] Any later violence stemmed from the attempted arrest of Evans or from the interactions with Knox.

[9] Later, for the first time in his reply brief to this Court, Evans argues that because there was no authority for an arrest for disorderly conduct, there could be no conviction for resisting arrest. This argument is waived as it was not made to the trial court. Rule 5A:18.

[10] The exact language of Code § 18.2-460(E) is,

> [a]ny person who intentionally prevents or attempts to prevent a law-enforcement officer from lawfully arresting him, with or without a warrant, is guilty of a Class 1 misdemeanor. For purposes of this subsection, intentionally preventing or attempting to prevent a lawful arrest means fleeing from a law-enforcement officer when (i) the officer applies physical force to the person, or (ii) the officer communicates to the person that he is under arrest and (a) the officer has the legal authority and the immediate physical ability to place the person under arrest, and (b) a

force to the person" or has "the immediate physical ability to place the person under arrest." Flight is a necessary element of the offense. *Joseph v. Commonwealth*, 64 Va. App. 332, 336 (2015). We have construed that subsection to require flight from the officer's "immediate span of control." *Peters v. Commonwealth*, 72 Va. App. 378, 388 (2020) (quoting *Joseph*, 64 Va. App. at 341). The police officer's "*immediate* physical ability to arrest [under Code § 18.2-460(E)(ii)] requires that the officer be close enough to 'appl[y] physical force to the person,' even if the defendant gets away before the officer can successfully lay hands on him." *Hackett v. Commonwealth*, 78 Va. App. 92, 98 (2023) (second alteration in original) (quoting Code § 18.2-460(E)).

In *Hackett*, this Court turned to Black's Law Dictionary for guidance in defining "immediate." The "[d]ictionary defines *immediate* as '[o]ccuring without delay; instant'; '[n]ot separated by other persons or things.'" *Id.* at 96-97 (all but first alteration in original) (quoting *Immediate*, *Black's Law Dictionary* (11th ed. 2019)). Using the Oxford English Dictionary, this Court found "immediate" to mean "[h]aving no person, thing, or space intervening . . . ." *Id.* at 97 (quoting *Immediate*, *Compact Edition of the Oxford English Dictionary* (1971)).

Here, we find that Evans was never within Officer Reed's immediate span of control and Officer Reed had no immediate physical ability to place Evans under arrest. When Officer Reed decided to arrest Evans, Evans was inside his home. The storm door stood between the two men, and when Evans went to shut his front door as well, Officer Reed opened the storm door and kicked in the front door.

Aside from the arrest itself, the entirety of the interaction occurred from behind a closed door or from a significant distance away. When the arrest was attempted to be made, a door separated Officer Reed from Evans. Under Virginia law, Evans was not in the immediate span of

reasonable person who receives such communication knows or
should know that he is not free to leave.

- 10 -

control of Officer Reed and therefore cannot be found to have "fled." There was never physical contact made before the arrest and it is shown that Evans was not in the immediate span of control because the arrest was not "instant." Officer Reed had to open a door and kick in another in order to make the arrest. We find that the Commonwealth failed to satisfy the close-proximity requirement here. Accordingly, the trial court should have granted Evans's motion to strike and erred in finding him guilty of resisting arrest.

### III. Animal Cruelty

Finally, Evans challenges his conviction for animal cruelty because there was no evidence that Knox was injured during the incident. He notes that although there was a laceration on the dog's gum, there was no testimony that Knox needed medical attention or was in pain. He argues that the evidence presented is not enough to sustain a conviction for animal cruelty.

To obtain a felony conviction for animal cruelty, the Commonwealth was required to prove the defendant "torture[d] any animal, willfully inflict[ed] inhumane injury or pain not connected with bona fide scientific or medical experimentation on any animal, or cruelly or unnecessarily beat[], maim[ed], mutilate[d], or kill[ed] any animal." Code § 3.2-6570(A)(ii).[11] "The

---

[11] Code § 3.2-6570(A) reads,

> [a]ny person who (i) overrides, overdrives, overloads, ill-treats, or abandons any animal, whether belonging to himself or another; *(ii) tortures any animal, willfully inflicts inhumane injury or pain not connected with bona fide scientific or medical experimentation on any animal, or cruelly or unnecessarily beats, maims, mutilates, or kills any animal, whether belonging to himself or another;* (iii) deprives any animal of necessary food, drink, shelter, or emergency veterinary treatment; (iv) sores any equine for any purpose or administers drugs or medications to alter or mask such soring for the purpose of sale, show, or exhibition of any kind, unless such administration of drugs or medications is within the context of a veterinary client-patient relationship and solely for therapeutic purposes; (v) ropes, lassoes, or otherwise obstructs or interferes with one or more legs of an equine in order to intentionally cause it to trip or fall for the purpose of engagement

- 11 -

Commonwealth can establish that a defendant willfully inflicted inhumane injury on an animal if it can present evidence that the defendant 'voluntarily acted with a consciousness that "inhumane injury or pain" would result.'" *Blankenship v. Commonwealth*, 71 Va. App. 608, 624 (2020) (quoting *Pelloni v. Commonwealth*, 65 Va. App. 733, 738-40, 743 (2016)).

This Court has struggled over the years to define and describe what it is to "willfully inflict inhumane injury" to an animal. "A voluntary act becomes willful, in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong." *Willful*, *Black's Law Dictionary* (10th ed. 2014). "The act [or omission] done must be intended *or* it must involve a reckless disregard for the rights of another and will probably result in an injury." *Barrett v. Commonwealth*, 268 Va. 170, 183 (2004) (emphasis added) (citing Code § 18.2-371.1(B)(1), which proscribes the "willful act or omission" of failing to provide necessary care for a child). Additionally, the correct application of "willfully" in a particular case will generally depend upon the character of the act involved and the attending circumstances. *Lambert v. Commonwealth*, 6 Va. App. 360, 363, 367 (1988).

Here, Evans struck Knox on the head after the dog began biting Evans's leg. This voluntary act of striking Knox does not rise to animal cruelty because Evans did not "willfully inflict inhumane injury" as defined under Virginia law. Evans's reflexive punches thrown at the dog were

---

in a rodeo, contest, exhibition, entertainment, or sport unless such actions are in the practice of accepted animal husbandry or for the purpose of allowing veterinary care; (vi) willfully sets on foot, instigates, engages in, or in any way furthers any act of cruelty to any animal; (vii) carries or causes to be carried by any vehicle, vessel or otherwise any animal in a cruel, brutal, or inhumane manner, so as to produce torture or unnecessary suffering; or (viii) causes any of the above things, or being the owner of such animal permits such acts to be done by another is guilty of a Class 1 misdemeanor.

(Emphasis added).

not intended to harm Knox and did not rise to the level of "willful." When deciding if an action is willful, we look at not only the circumstances surrounding the action, but the intent behind it. *Barrett*, 268 Va. at 183; *Lambert*, 6 Va. App. at 363, 367.

Punching and kicking a police dog has been found to be sufficient to rise to animal cruelty. *Blankenship*, 71 Va. App. at 624-25. However the distinction is that in prior cases the police dog suffered severe injuries after a prolonged, repeated beating. Knox, at the very worst, suffered a small laceration on the inside of his mouth. In comparison, the dog in *Blankenship* received a "digestive injury" to the point where it stopped eating and was lethargic. *Id.* at 624. Not only is the small laceration not a serious injury, there is no way to confirm it was a result of the punches thrown by Evans, as Officer Reed did not evaluate Knox before their shift.

Evans's actions were an in-the-moment response to being attacked in his own home by a police dog. There was no "conscious wrong or evil purpose" behind his actions as he merely did enough to get the dog to release his leg. When looking at the surrounding circumstances, it cannot be said that Evans intended to cause harm to Knox in a way punishable under Virginia law. Therefore, the trial court erred in denying the motion to strike and finding Evans guilty of animal cruelty.

CONCLUSION

For the foregoing reasons, we reverse the trial court's judgment and dismiss the convictions.

*Reversed and dismissed.*